IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

v.

KEVIN BRESLIN, and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

INDICTMENT

Case No. 23   CR   010   WMC

18 U.S.C. § 1347
18 U.S.C. § 2
18 U.S.C. § 1343
18 U.S.C. § 1341
18 U.S.C. § 371
18 U.S.C. § 1956(h)
18 U.S.C. § 982
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

Defendants.

THE GRAND JURY CHARGES:

COUNT 1

At times material to this indictment:

Relevant Individuals and Entities

1.      Defendant KEVIN BRESLIN (BRESLIN) was the managing member and

Chief Executive Officer (CEO) of KBWB OPERATIONS, LLC d/b/a Atrium Health and

Senior Living (Atrium).  BRESLIN started with Atrium in June 2014, and was fired in

August 2018.  As managing member of Atrium, BRESLIN was in charge of overall

operations and supervised all aspects of the business including: accounting, finance,

treasury, payables, payroll, budgeting, and staffing.  BRESLIN made the final decisions

on financial spending, budgeting, and reporting as well as clinical operations at

Atrium's facilities.  BRESLIN had a B.S. degree in accounting, and held a Certified Public Accountant license in the State of New Jersey.  BRESLIN received a salary of approximately $1,000,000/year from Atrium, as well as weekly guaranteed payments and distributions of approximately $30,000 to $40,000 paid to him and each of the other owners of Atrium.

2.      Defendant KBWB OPERATIONS, LLC d/b/a Atrium Health and Senior Living (Atrium) was a company that constructed, owned, and operated nursing homes - - otherwise known as skilled nursing facilities (SNFs) -- and assisted living facilities (ALFs) -- in New Jersey, Wisconsin, and Michigan.  Atrium was owned by six members, including defendant BRESLIN, who was a 20% owner.

a.      As of April 2016, Atrium operated 24 SNFs and 9 ALFs in Wisconsin and Michigan with over 1,900 licensed beds. Atrium employed over 1,700 people at its Wisconsin and Michigan facilities.  Atrium operated six SNFs in New Jersey and built three additional New Jersey facilities between 2015 and 2018.

b.      On September 7, 2018, the Wisconsin and Michigan SNFs were placed into a receivership by court order from the Wood County Circuit Court.

3.      Atrium was organized into 80 related corporate entities under one parent corporation (defendant KBWB OPERATIONS, LLC).  Two of the subsidiary entities under the parent corporation included KBWB Operations-Rice, LLC, and KBWB Operations-Midwest Additions, LLC, which were the holding companies for the 24 SNFs and 9 ALFs located in Wisconsin and Michigan. These facilities included:

a.      Atrium Post Acute Care of Appleton,

b.   Atrium Post Acute Care of Black River Falls,
c.   Atrium Post Acute Care of Bloomer,
d.   Atrium Post Acute Care of Chetek,
e.   Atrium Post Acute Care of Chilton,
f.   Atrium Post Acute Care of Ellsworth,
g.   Atrium Post Acute Care of Kewaunee,
h.   Atrium Post Acute Care of Lancaster,
i.   Atrium Post Acute Care of Little Chute,
j.   Atrium Post Acute Care of Marshfield,
k.   Atrium Post Acute Care of Menominee, MI,
l.   Atrium Post Acute Care of Mineral Point,
m.   Atrium Post Acute Care of Neenah,
n.   Atrium Post Acute Care of New Holstein,
o.   Atrium Post Acute Care of Oconto Falls,
p.   Atrium Post Acute Care of Plymouth,
q.   Atrium Post Acute Care of Shawano at Birch Hill,
r.   Atrium Post Acute Care of Shawano at Evergreen,
s.   Atrium Post Acute Care of Shawano at Maple Lane,
t.   Atrium Post Acute Care of Stevens Point,
u.   Atrium Post Acute Care of Two Rivers,
v.   Atrium Post Acute Care of Weston,
w.   Atrium Post Acute Care of Williams Bay, and
x.   Atrium Post Acute Care of Wisconsin Rapids.

4.      Atrium generated revenue streams from its SNFs by providing services to

a mix of residents including: (1) private pay residents; (2) residents with private

insurance; (3) residents on Medicare; and (4) residents on Medicaid.  From January 2015

through September 2018, Atrium's Wisconsin SNFs billed Medicare over $189,000,000 in

services, and received over $49,000,000.  During that same time, Atrium's Wisconsin

SNFs billed Medicaid over $218,000,000 in services, and received over $93,000,000.

5.      Atrium had a self-funded health insurance plan for employees. Atrium

used third-party administrators (initially Horizon Blue Cross Blue Shield and later

Insurance Administrators of America, Inc.) to manage the claims and pay the health

care providers. Atrium withheld insurance premiums from their employees' paychecks

and was supposed to use these funds to reimburse the third-party administrator for payment of the health claims.

6.      Atrium also had a 401(k) retirement/pension plan (the Plan) which was established pursuant to the Employee Retirement Income Security Act of 1974 (ERISA). Under the Plan, Atrium employees could opt to defer a portion of their wages by placing them into their own 401(k) retirement account. Atrium withheld employees' 401(k) contributions from their paychecks and was supposed to pay these funds over to a third-party pension administrator to manage the funds. Atrium was required under ERISA to deposit their employees' contributions into the 401(k) account as soon as possible after they were withheld from the employees' paychecks. These withholdings from the employees' paychecks were Plan assets being held in trust by Atrium, and could not be used for any other purpose. Defendant BRESLIN was a Plan trustee on behalf of Atrium, and exercised discretionary authority, control, and responsibility in the management and administration of Atrium's Plan.

<u>The Medicare and Medicaid Programs</u>

7.      The Medicare Program was created in 1965 as part of the Social Security Act to assist elderly and disabled persons in the purchase of necessary health care. Medicare reimbursed a SNF for up to 100 days of skilled nursing care that followed a qualifying hospital stay. Medicare also paid for rehabilitation therapy and pharmacy costs for Medicare beneficiaries.

8.      The Medicaid Program was also established by the Social Security Act to provide benefits to aged, blind, or disabled individuals whose income and resources

4

were insufficient to meet the costs of necessary medical services. Medicaid paid for beneficiaries to reside in SNFs, and also paid for certain medical expenses and prescription drugs.

9.     The Centers for Medicare and Medicaid Services (CMS) (formerly the Health Care Financing Administration) was the federal agency within the United States Department of Health and Human Services (HHS) charged with administering Medicare and Medicaid through its contractors.

10.    Medicare and Medicaid were health care benefit programs as defined by Title 18, United States Code, Section 24(b).

11.    Wisconsin Medicaid, administered by the Wisconsin Department of Health Services (DHS), was established to provide health care services and benefits to those who, due to economic circumstances, could not otherwise afford such health care services and benefits. Wisconsin Medicaid was funded jointly by the state of Wisconsin and by HHS, acting through CMS. Wisconsin Medicaid paid for recipients to reside in SNFs. Wisconsin Medicaid also paid for certain medical expenses and prescription drugs for the recipients.

12.    Over half of the residents at Atrium's nursing facilities in Wisconsin were Medicare or Medicaid recipients, meaning that Medicare and Medicaid were paying the largest portion of the revenue that Atrium was collecting from its Wisconsin sites.

<u>Laws Governing the Standard of Care at SNFs</u>

13.    The nursing home industry was a highly regulated industry structured to protect vulnerable individuals who did not require hospitalization, but nonetheless

5

required some type of ongoing medical services. Often the stay for a nursing home resident encompassed a long period of time, sometimes years. Nursing homes were required to operate in a manner that would enhance residents' quality of life by providing services and activities to attain and maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care.

14.    Federal statutes and regulations mandated that nursing facilities comply with federal requirements relating to the provision of services and quality of care. 42 U.S.C. § 1396r(b). These statutes and regulations included the following:

a.    A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident. 42 U.S.C. § 1396r(b)(1)(A).

b.    A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a plan of care which describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met.  42 U.S.C. §§ 1395i-3; 1396r(b)(2)(A); 42 C.F.R. § 483.21(a),(b) (previously at 42 C.F.R. § 483.20(k), re-designated and revised in 2016); 42 C.F.R. § 483.24 (previously at  42 C.F.R. §  483.25, re-designated and revised in 2016).

c.    A nursing home must treat each resident with respect and dignity and protect and promote the rights of the resident.  42 C.F.R. § 483.10.

d.      Nursing home providers could not submit claims for services that are of a quality which fails to meet professionally recognized standards of health care. 42 U.S.C. § 1320c-5(a)(2).

e.      A nursing facility must fulfill the residents' care plans by providing, or arranging for the provision of, nursing and related services and medically-related social services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, pharmaceutical services, and dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident. 42 U.S.C. § 1396r(b)(4)(A)(i-iv); 42 C.F.R. § 483.21(a),(b) (previously at 42 C.F.R. § 483.20(k), re-designated and revised on 2016); 42 C.F.R. § 483.24 (previously at 42 CFR § 483.25, re-designated and revised on 2016); 42 C.F.R. § 483.60 (previously at 42 C.F.R. § 483.35, re-designated and revised in 2016).

f.      A nursing facility must also ensure that a resident maintains acceptable parameters of nutritional status, including body weight. 42 C.F.R. § 483.25.

g.      A nursing facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident. 42 C.F.R. § 483.35 (previously at 42 C.F.R. § 483.30, re-designated and revised in 2016).

h.      A nursing facility must provide care and services for activities of daily living, including hygiene (bathing, dressing, grooming, and oral care), mobility (transfer and ambulation), elimination (toileting), and dining (eating, including meals

and snacks). 42 C.F.R. § 483.24(b) (previously at C.F.R. § 483.25(a), re-designated and revised in 2016).

      i.     A nursing facility must be designed, constructed, equipped, and maintained to protect the health and safety of residents, personnel, and the public. 42 C.F.R. § 483.90 (previously at 42 C.F.R. § 483.70, re-designated and revised in 2016).

      j.     A nursing facility must operate and provide services in compliance with all applicable federal, state, and local laws and regulations and with accepted professional standards and principles which apply to professionals providing services in such a facility. 42 U.S.C. §§ 1396r(d)(4)(A).

      k.     The Social Security Act mandated that nursing facilities that participate in Medicare and Medicaid programs meet certain specific requirements in order to qualify for participation and receive taxpayer dollars from these programs. These requirements were set forth at 42 C.F.R. § 483.1 et seq. and served as the basis for survey activities for the purpose of determining whether a facility met the requirements for participation in Medicare and Medicaid. 42 C.F.R. § 483.1. These regulations also required that providers comply with all federal and state tax obligations. 42 U.S.C. § 1396r.

15.     Wisconsin state regulations also mandated certain standards of care for residents of nursing homes. Wis. Stat. § 483. State regulations required that facilities provide the same quality of care to a resident whose care was being paid for from Medicaid or Medicare funds as those residents whose care is being paid for from other sources. Wis Stat. §§ 483.5 - 483.95.

8

16.    By accepting Medicare and Medicaid residents, a SNF provider assumed the duty to have in place the staff, resources, and procedures necessary to provide the necessary care and comply with the relevant medical and legal standards.  42 C.F.R. § 483.20.

17.    Federal law established a review and enforcement scheme in which state agencies, under contract with CMS, were primarily responsible for regularly monitoring and enforcing compliance with the quality of care standards through on-site inspections (commonly called "state surveys"). 42 U.S.C. § 1395aa(a), 1396r(g)(1)(A); 42 C.F.R. § 431.18, 488.10(a), 488.20, 488.301.

18.    Atrium's Wisconsin SNFs were surveyed by the Wisconsin DHS Division of Quality Assurance (DQA), Bureau of Nursing Home Resident Care, on behalf of HHS, to ensure compliance with federal and state regulations. The DQA was responsible for performing the certification and survey function of nursing homes in Wisconsin on a periodic basis, and more frequently when there were complaints or other triggering events.  Such surveys could result in deficiency citations by DQA, leading to enforcement actions ranging from fines and civil monetary penalties to decertification from the Medicare and Medicaid programs.

### The Governing Body and Administration

19.    A nursing home facility was required to have persons functioning as a governing body that were legally responsible for establishing and implementing policies regarding the management and operation of each facility.  42 C.F.R. § 483.70 (previously at 42 C.F.R. § 483.75, re-designated and revised in 2016). The governing

9

body was supposed to appoint an administrator who was responsible for the daily management of each facility.

<u>Agreements with Medicare and Medicaid Programs</u>

20.     In order to participate in the Medicare program and receive payments, providers were required to be licensed by the state, enter into provider agreements with CMS, and be certified in compliance with mandatory federal standards. 42 U.S.C. § 1395cc(a)(1); 42 C.F.R. § 442.12. In order to obtain certification with Medicare, the provider was required to execute enrollment applications on behalf of each nursing home. In these applications, the provider agreed and certified under the penalties of perjury, among other things, that the provider:

a.     Understood and would abide by all applicable Medicare laws, regulations, and program instructions;

b.     Understood that payment of claims by Medicare were contingent upon the claims complying with all applicable Medicare laws, regulations, and program instructions;

c.     Will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard the truth or falsity thereof; and

d. ·   Has read the penalties for falsifying any information on the enrollment application including the certifications of compliance with all applicable Medicare laws, regulations, and program instructions.

21.     In order to participate in Medicaid and receive payments, providers were required to enter into agreements with the state that incorporated the federal requirements for participation, as well as the applicable state requirements, and be certified as being in compliance with the quality of care requirements under 42 U.S.C. § 1396r(b)-(d), and the standards governing payment under 42 C.F.R. § 442.  In order to obtain certification with Medicaid, the provider was required to execute a provider agreement on behalf of each nursing home. In these agreements, the provider agreed and certified under the penalties of perjury, among other things, that the provider would:

a.     Submit a claim for payment with information that is true, accurate, and complete, and that the payment of the claim will be from Federal and State funds;

b.     Maintain full compliance with all certification requirements established by HHS and Wisconsin DHS; and

c.     Maintain full compliance with the requirements of Title XIX of the Social Security Act and the regulations promulgated thereunder relating to skilled care facilities.

<u>Resident Funds Held in Trust</u>

22.     Nursing home residents had the right to manage their own financial affairs. This included keeping personal funds on deposit with the nursing home facility. The nursing home provider was required to act as a fiduciary of the residents' personal funds and "hold, safeguard, manage, and account for the personal funds" on behalf of

11

the resident. 42 C.F.R. § 483.10(f)(10)(i)(previously at 42 C.F.R. § 483.10(c)(1)-(2), re-designated in 2016).

23.     The nursing home provider was required to establish and maintain an accounting system for the residents' funds, and was precluded from commingling any of the resident funds with the nursing home facility funds, or with the funds of any other resident.  42 C.F.R. § 483.10(f)(10)(iii)(A)-(B) (previously at 42 C.F.R. § 483.10(c)(4), re-designated in 2016).

24.     The nursing home provider was required to produce to the resident a quarterly statement of the activity and balance in their resident trust account.  42 C.F.R. § 483.10(f)(10)(iii)(C).

25.     Upon discharge, eviction, or death of the resident, the nursing home provider was required to refund to the resident's estate within thirty days, the resident's personal funds on deposit with the nursing home facility, and to provide a final accounting of those funds. 42 C.F.R. § 483.10(f)(10)(v)(previously at 42 C.F.R. § 483.10(c)(6), re-designated and revised in 2016).

26.     Atrium maintained resident trust accounts for its Wisconsin residents by facility. These accounts were originally at US Bank in Appleton, Wisconsin.  These accounts were moved in January 2018 to Provident Bank in New Jersey.  Atrium also maintained security deposit accounts for private pay residents who were required to pay a security deposit for their room.  The resident trust account balances, and security deposits, were statutorily required to be refunded to the resident or their family members when the resident left the nursing home. 42 C.F.R. § 483.10(f)(10)(v).

Scheme To Defraud

27.     From on or about January 1, 2015 to in or about September 2018, in the

Western District of Wisconsin, and elsewhere, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

knowingly and willfully executed, and attempted to execute, a scheme to defraud, and

to obtain by means of false and fraudulent material pretenses, representations, and

promises, money under the custody and control of a health care benefit program, in

connection with the delivery of or payment for health care benefits, items, or services.

28.     It was part of the scheme to defraud that the defendants obtained money

from Medicare and Medicaid using false pretenses, false statements, and material

omissions. As a Medicare and Medicaid provider, the defendants certified that they

understood and would follow all of the Medicare and Medicaid statutes and

regulations, including the quality of care standards as set forth in Title 42 of the Federal

Code and Regulations, which they did not do.  The defendants certified that they would

operate their Wisconsin SNFs with adequate staffing, supplies, environment, and

ancillary services, which they did not do.  The defendants certified that they would

operate their Wisconsin SNFs in a manner that would enhance the resident's quality of

life by providing them services and activities to attain and maintain the highest

practicable physical, mental, and psychosocial well-being of each resident in accordance

with a written plan of care, which they did not do.  Instead of using their Medicare and

Medicaid reimbursement funds to take care of the residents in their Wisconsin SNFs,

and ensure that the Wisconsin residents attained or maintained the highest practicable physical, mental, and psychosocial well-being, as required by Title 42, the defendants diverted these funds for other purposes.

29.    It was further part of the scheme to defraud that the legally-required quality of care standards were not met because (1) the Wisconsin SNFs lacked funds to adequately staff many departments including nursing, dietary, kitchen, housekeeping, and maintenance; and (2) the vendors to the Wisconsin SNFs cut off goods and services needed by residents because of non-payment of their bills.

30.    It was further part of the scheme to defraud that the defendants diverted funds from the Wisconsin SNFs.  These diversion payments included:

a.    Guaranteed payments and distributions to the Atrium owners. From January 1, 2015 to August 1, 2018, these owner payments and distributions totaled in excess of $37,000,000.

b.    Guaranteed monthly return-on-investment (ROI) payments to investors who had invested over $20,000,000 to help finance the construction of new SNFs in New Jersey.

c.    Construction costs to build three new SNFs in New Jersey.

d.    Personal expenditures for an Atrium owner that included: (1) monthly payments of approximately $60,000 to the IRS for unpaid taxes; (2) monthly payments of approximately $75,000 to Apple Chase for loan repayments; and (3) monthly payments of approximately $60,000 to SummitBridge Investments for mortgage debts.

14

31.     It was further part of the scheme to defraud that the defendants caused the insufficient staffing of Certified Nursing Assistants (CNAs) at its Wisconsin SNFs. As a result, the defendants failed to meet the statutorily-required quality of care standards, including but not limited to:

a.     Staff failed to reposition bed-ridden residents as required in the care plans to prevent bed sores and pressure ulcers.

b.     Staff could not bathe residents as scheduled or meet residents additional, minimal hygiene needs.

c.     Staff failed to change soiled diapers causing skin breakdowns, rashes, and a loss of dignity.

d.     Staff failed to change soiled bed linens and bed pads.

e.     Staff failed to chart or accurately report residents' weights and other health information in residents' care plans and on CNA assignments.

f.     Staff moved residents with mechanical lifts without adequate staffing.

g.     Staff failed to timely respond to call buttons which led to resident falls and forced incontinence.

h.     Staff failed to develop individualized resident care plans to identify and address the existing needs and potential risks for each resident.

i.     Staff failed to follow existing care plans because of lack of time and staff.

j.      Staff failed to provide needed feeding and nourishment assistance and care.

k.      Staff failed to keep track of residents' physical location.

32.     It was further part of the scheme to defraud that the defendants caused the insufficient staffing of nurses at its Wisconsin SNFs.  As a result, the defendants failed to meet the statutorily-required quality of care standards, including but not limited to:

a.      Failure to provide adequate, or any, wound care treatment or pain management.

b.      Failure to chart residents' health information and medications.

c.      Failure to timely provide medication.

33.     It was further part of the scheme to defraud that the defendant caused the insufficient staffing of dietary/kitchen staff, which led to the defendants failing to meet statutorily-required quality of care standards, including but not limited to:

a.      Resident weights were not monitored and reviewed for gains or losses.

b.      Diet changes were not updated or monitored in residents' charts.

c.      Due to a lack of food deliveries to unpaid vendors and the need to buy replacement groceries on the spot, menu substitutions and changes were not monitored for nutritional value or approved by a registered dietician.

      d.     Food portions, food variety, and resident preferences were not taken into consideration due to a lack of food deliveries and the need to buy replacement groceries on the spot.

      e.     Resident assessments for dietary needs and special requirements were not done by a registered dietician as required.

34.     It was further part of the scheme to defraud that the defendants caused the non-payment of food vendor bills, causing frequent food deliveries to be stopped at many Wisconsin SNFs, which led to the defendants failing to meet statutorily-required quality of care standards, including but not limited to:

      a.     Staff bought replacement food at local grocery stores on the spot to cover the shortages, but could not obtain the food as planned in the meal menus. This led to a lack of adequate and appropriate food and snacks for the residents.

35.     It was further part of the scheme to defraud that the defendants caused the nonpayment of medical supply vendors, causing deliveries to be stopped or delayed, which led to the defendants failing to meet statutorily-required quality of care standards, including but not limited to:

      a.     A shortage of diapers in the necessary sizes to fit residents to ensure health and hygiene.

      b.     Inadequate wound care supplies.

      c.     Inadequate supplies to provide appropriate resident hygiene.

      d.     A lack of mechanical lift slings in different sizes based on residents' weights.

e.     A lack of respiratory supplies including masks and nasal cannulas.

36.     It was further part of the scheme to defraud that the defendants caused the nonpayment of service vendors, causing numerous services to be cut off, which led to the defendants failing to meet statutorily-required quality of care standards, including but not limited to:

a.     An absence of physical therapy for residents.

b.     A lack of agency-supplied nurses or CNAs to care for residents per the staffing schedules.

c.     Periods of time when there were no functioning fire alarm monitoring systems, and staff at some of the Wisconsin SNFs had to be diverted from resident care to fire watch duties.

d.     Periods of time when there was no phone and fax service.  This prevented staff from obtaining prescriptions/orders faxed in from doctors. Door alarms did not work during the disruption of phone services.  Staff had to monitor exit doors to guard against vulnerable residents leaving the facility.

e.     Periods of time when there was no Internet service. As a result, staff could not readily access the electronic medical records system to update resident records or readily access residents' medication lists to distribute medication.

f.     Periods of time when there was no trash pickup resulting in unsanitary conditions.

37.     It was further part of the scheme to defraud that the defendants caused the nonpayment of contractors hired to do repairs and maintenance of the physical

plant facilities, which led to the defendants failing to meet statutorily-required quality of care standards, including but not limited to:

      a.     HVAC systems were not repaired or replaced. This left residents' rooms too warm in the summer because the air conditioning system did not work properly. Staff used fans to blow air down the hallways to try to keep the residents cool. In some locations, portable air conditioning systems were brought in to cool residents' rooms. In the winter, resident rooms were too cold and residents were consolidated and relocated to wings in the building where there was heat.

      b.     Roofs and windows leaked. Water came into residents' rooms and caused ceiling and wall damage, as well as mold in the buildings.  Pails were put in residents' rooms to collect the water.  Mold was found in resident room walls and windows, as well as in air ducts.

      c.     Broken toilets and showers were not repaired.

      e.     Plumbing failed resulting in unsafe and unsanitary conditions.

      f.     Electrical lines were in disrepair and posed a fire hazard.

      g.     Ice makers were not repaired, so staff had to make ice runs and buy bags of ice at the grocery store for the residents.

      h.     Contractors refused to do repairs at Atrium locations because of nonpayment and bounced checks.

      38.     It was further part of the scheme to defraud that the defendants failed to disclose to CMS the fact that they were: (1) diverting the reimbursement funds for other purposes; (2) not providing the Wisconsin SNF residents with the quality of care

required under Title 42 of the Federal Code and regulations; (3) not paying their employee income tax withholdings and employment taxes over to the IRS and Wisconsin Department of Revenue; and (4) stealing funds from the Wisconsin SNF resident trust accounts for short periods of time to help with cash flow.

39.     It was further part of the scheme to defraud that the defendants attempted to hide their quality of care deficiencies from Wisconsin DQA-Bureau of Nursing Home state surveyors by: (1) artificially increasing the staffing in the SNFs during state surveys; and (2) proposing plans of correction which the defendants knew could not be met because Atrium did not have the cash flow required to make the proposed fixes.

<u>Execution of the Health Care Fraud Scheme</u>

40.     The defendants executed the health care fraud scheme by:

a.     Filing Medicare Enrollment Applications (Form 855A) for Atrium's 23 SNFs in Wisconsin in 2015 and 2016, which certified that Atrium would follow all applicable Medicare laws, regulations and program instructions, and acknowledged that payment of the Atrium claims were contingent upon those claims complying with all applicable Medicare laws, regulations, and program instructions.

b.     Filing Wisconsin Medicaid Provider Agreements for Atrium's 23 SNFs in Wisconsin in 2015 and 2016, which certified that Atrium would follow all federal and state requirements for participation including compliance with the quality of care standards under 42 U.S.C. § 1396r(b)-(d), and the standards governing payment under 42 U.S.C. § 442.

c.      Failing to provide the quality of care required under Title 42 U.S.C. § 1396r(b) and 42 CFR § 483, to its residents in its Wisconsin SNFs.

d.      Falsely representing that the quality of care required under Title 42 U.S.C. § 1396r(b) and 42 CFR § 483, had been provided to its residents in its Wisconsin SNFs.

e.      Falsely representing that vendors who had provided services to the Wisconsin SNFs had been paid.

f.      Concealing the diversion to the defendants' use and benefit, funds which were paid by Medicare and Medicaid to the Wisconsin SNFs, for the purpose of providing the quality of care required under Title 42 U.S.C. § 1396r(b) and 42 CFR § 483 to its residents, and for paying vendors for goods and services necessary for the statutorily-required quality care.

41.     The defendants further executed the health care fraud scheme by causing the diversion of CMS funds paid to its Wisconsin SNFs, to pay for uses other than for taking care of its Wisconsin SNF residents, which caused a lack of sufficient staffing and sufficient goods and services for the residents. This included:

a.      Weekly payments wired to the Atrium owners totaling over $172,000 per week.

b.      These payments to the owners included, among others, wires on February 16 and 23, 2018; March 8, 9, 16, and 23, 2018; April 6 and 13, 2018; and May 21, 2018.

c.      During the same time of the owner wire payments, employee paychecks were bouncing which caused staff to quit, vendors were not being paid or their payments were bouncing which caused them to stop delivering goods and services, and resident refunds were not being paid or their refund checks were bouncing.

(All in violation of Title 18, United States Code, Sections 1347 and 2).

<u>COUNTS 2-7</u>

1-26.   Paragraphs 1-26 of Count 1 are incorporated here.

<u>Scheme to Defraud</u>

27.     On or about January 1, 2015, to on or about September 7, 2018, in the Western District of Wisconsin and elsewhere, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

knowingly and with the intent to defraud, devised and participated in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and by concealment of material facts.

**Fraud on CMS**

28-41.  Paragraphs 28-41 of Count 1 are incorporated here.

**Fraud on Atrium SNF residents and family members**

42.     It was part of the scheme to defraud that in the first four months of 2018, the defendants repeatedly took money from residents' trust accounts and security deposit trust accounts, later replacing the stolen funds.

43. It was further part of the scheme to defraud that the defendants caused the issuance of monthly resident trust fund statements to residents, which did not disclose the repeated and unauthorized theft and replacement activity in 2018.

44. It was further part of the scheme to defraud that when various Atrium employees brought these trust fund embezzlements to the attention of the defendants, the employees were lied to and told the resident trust account sweeps had been a mistake, would not happen again, and the matter had been fixed.

45. It was further part of the scheme to defraud that the defendants also misappropriated the personal funds in the resident trust accounts, and security deposit accounts, by not issuing refunds within thirty days of the residents' deaths, as required by Title 42.

46. It was further part of the scheme to defraud that in some instances, the defendants issued refund checks that bounced to residents' family members. The defendants knew the refund checks would bounce because there were insufficient funds to cover the checks.

**Fraud on Atrium employees**

47. It was further part of the scheme to defraud that the defendants withheld health insurance premiums from Atrium's Wisconsin employees' paychecks, but failed to pay those monies over to the third-party administrator for use in paying health claims. As a result, the third-party administrator stopped paying the health claims in March 2018, leaving the employees (who thought they had health insurance), liable for paying their health claims.

48.     It was further part of the scheme to defraud that the defendants withheld 401(k) retirement savings account contributions from Atrium's Wisconsin employees' paychecks, but failed to pay those monies over to the third-party pension administrator.

49.     It was further part of the scheme to defraud that the defendants issued paychecks and W-2 forms to Atrium's employees representing that their health insurance premiums and 401(k) contributions had been taken out of the employees' pay, leaving the employees to believe these funds had been paid over to the respective third-party administrators.  The defendants failed to tell their employees that these funds were not being remitted to the respective third-party administrators, but instead were diverted by the defendants to cover Atrium's cash flow deficiencies and pay other expenditures.

### Fraud on Atrium vendors

50.     It was further part of the scheme to defraud that the defendants obtained goods and services from Wisconsin vendors on credit promising to timely pay the vendors' bills, but then did not pay them on time, or pay them at all, or paid them a fraction of the amount owed.  The defendants ignored the vendors' requests for payment until the vendors threatened to cut off the goods and services. The defendants then dropped the vendor and switched to a new vendor and started the practice all over again. This conduct had the effect of obtaining the goods and services for free, or for a fraction of the value of the products, which caused great harm to some of the smaller Wisconsin vendors who needed these payments to stay solvent.

51.     It was further part of the scheme to defraud that with some vendors, the defendants lied to them and gave them small lulling payments for a fraction of the outstanding balance due, to string them along and keep the goods and services flowing on credit.

52.     It was further part of the scheme to defraud that with some vendors, the defendants waited until the vendor threatened to cut off the goods and services, and then issued the vendor a check which the defendants knew would bounce because there were insufficient funds in the account to cover the check.  When the vendor indicated that the check had bounced, the defendants lied and told the vendor to represent the check to the bank because there now were sufficient funds in the account, which was false.  This had the effect of stringing the vendor along to keep them supplying the goods and services on credit.

53.     It was further part of the scheme to defraud that with some vendors, the defendants entered into payment plans with them as a way to avoid having the vendor cut off the supply of goods and services. The defendants would make some initial payments under the plan to keep the goods and services flowing, and then stop the payments. This tactic strung along the vendors and bought the defendants more time to even out their cash flow deficiencies.

**Fraud on State Taxing Authorities**

54.     It was further part of the scheme to defraud that the defendants evaded paying over the Wisconsin employee state income tax withholdings to the Wisconsin Department of Revenue (WDOR) for the first three quarters of 2018.

55.     It was further part of the scheme to defraud that the defendants evaded paying the Wisconsin unemployment insurance taxes due to the Wisconsin Department of Workforce Development (DWD) for the period covering the fourth quarter of 2016 through the third quarter of 2018.  The defendants entered into an installment payment plan with DWD in late 2017 to pay the outstanding tax balance, but beginning in April 2018 through August 2018, the defendants issued checks to DWD that were returned for insufficient funds.  As a result, DWD terminated the installment payment plan on August 16, 2018, and issued levy notices against the Wisconsin SNFs.

<u>Wires</u>

56.     On or about the dates listed below, in the Western District of Wisconsin and elsewhere, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

for the purpose of executing this scheme, knowingly caused to be transmitted, by means of wire communication in interstate commerce, the signals and writings described below for each count:

| COUNT | DATE | NATURE OF WIRE COMMUNICATION |
|-------|------|------------------------------|
| 2 | 3-14-18 | Email at 10:50 am from D.M. in Atrium's office in Appleton, WI to G.M. in Atrium's office in Little Falls, NJ re: need to respond to NSF check issued to vendor and his threat to turn in Atrium for fraud. |
| 3 | 6-20-18 | Email at 8:13 am from D.G. in Chicago, IL to G.M. in Atrium's office in Little Falls, NJ re: receipt of NSF check and need to pay their bill or face a credit hold on the account. |

| 4 | 6-20-18 | Email at 8:20 am from D.G. in Chicago, IL to BRESLIN in Atrium's office in Little Falls, NJ re: need to respond given that G.M. is ignoring calls and emails. |
| 5 | 7-18-18 | Email at 5:14 pm from L.V. in Atrium's office in Little Falls, NJ to D.K. in Charlotte, NC re: checks bounced and need to wire funds to pay off balance |
| 6 | 7-23-18 | Email at 11:09 am from C.D. in Atrium's office in Appleton, WI to G.M. in Atrium's office in Little Falls, NJ re: need to respond to NSF check issued to vendor and his threat to go to court. |
| 7 | 7-26-18 | Email at 12:08 p.m. from G.M. in Atrium's office in Little Falls, NJ to E.S. in Lancaster, WI re: reasons for bouncing checks were due to "unforeseen circumstances." |

(All in violation of Title 18, United States Code, Section 1343).

COUNTS 8-10

1-55.    Paragraphs 1-55 of Count 2 are incorporated here.

Mailings

56.    On or about the dates listed below, in the Western District of Wisconsin and elsewhere, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

for the purpose of executing this scheme, knowingly used and caused to be used, the

U.S. Mails, and private interstate carriers, as follows:

| COUNT | DATE | NATURE OF MAILING |
|---|---|---|
| 8 | 3-31-18 | The defendants caused to be delivered an item of mail according to the directions thereon, a resident trust account statement dated 3-31-18 for resident R.H. living at Atrium's SNF in Black River Falls, sent to M.H. at an address in Janesville, WI  53546. |

27

| 9 | 5-31-18 | The defendants caused to be delivered an item of mail according to the directions thereon, a check (number 438356), dated 5-31-18, in the amount of $2,729.31, payable to City of Lancaster, at 206 S. Madison Street, Lancaster, WI 53813. |
| 10 | 7-19-18 | The defendants caused to be delivered an item of mail according to the directions thereon, a check (number 004790), dated 7-19-18, in the amount of $13,814.02, payable to J.C., (care/of G.V.), at an address in, Black River Falls, Wisconsin 54615. |

(All in violation of Title 18, United States Code, Section 1341).

## COUNT 11

1-26.   Paragraphs 1-26 of Count 1 are incorporated here

### The Internal Revenue Code

27.     The Internal Revenue Service (IRS) was an agency of the United States Department of the Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the United States.

28.     The Internal Revenue Code and associated statutes and regulations required employers to withhold from employees' gross pay federal income taxes and Federal Insurance Contribution Act (FICA) taxes, which represent Social Security and Medicare taxes, and to account for and pay the withheld taxes to the IRS on a quarterly basis, but no later than the last day of the month following the end of the quarter.  These taxes are commonly referred to collectively as "trust fund taxes."  Trust fund taxes are to be held in trust for the United States by the employer and are required to be paid over for the benefit of employees.

28

29.     In addition to the trust fund taxes that must be withheld from pay, employers are separately required to make contributions under FICA for Social Security and Medicare in amounts matching the amounts withheld from their employees' pay for those purposes.  Such employer contributions are likewise required to be remitted to the IRS no later than the last day of the month following the end of the quarter.  Trust fund taxes and employers' FICA contributions are commonly referred to as "employment taxes."

30.     Employers are required to file, one month after the conclusion of the calendar quarter, an Employer's Quarterly Federal Tax Return, Form 941, setting forth the total amount of income taxes withheld, the total amount of Social Security and Medicare taxes due, and the total tax deposits.

<u>Conspiracy</u>

31.     From on or about October 1, 2016 to in or about August 2018, in the Western District of Wisconsin, and elsewhere, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

knowingly conspired with each other, and with others known and unknown to the grand jury, to defraud the United States by impeding, impairing, obstructing, and defeating by craft, trickery, deceit, and dishonest means, the lawful functions of a department or agency of the United States, specifically: the U.S. Department of Treasury, Internal Revenue Service in the ascertainment, computation, assessment, and collection of federal taxes.

Manner and Means

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

32.     The defendants withheld income taxes and employment taxes from their Wisconsin employees' paychecks, but failed to pay all of these withheld funds over to the IRS. This conduct started in the third quarter of 2016 and continued into 2017.  A refinance of Atrium's Princeton, New Jersey SNF at the end of 2017, helped pay off part of this initial tax liability.  However, the defendant restarted this same conduct going into 2018.

33.     The defendants filed Forms 941 with the IRS indicating the tax amounts withheld from their employees' wages, but failed to pay all of the withheld taxes when they filed the 941 tax returns.

34.     The defendants issued W-2 Forms to the IRS and to Atrium employees indicating that these income tax amounts had been withheld. The defendants caused Wisconsin SNF employees, who believed these tax withholdings had been paid in to the IRS, to prepare their personal Form 1040 tax returns listing these withholdings as having been paid over to the IRS, which was false.  The employees attached a copy of their Atrium W-2 Form with their tax returns, and in some cases, requested a refund of the purportedly paid-in taxes to the IRS. As a result of these requests for refunds from Atrium employees on their tax returns, the IRS paid out tax refunds to the employees although the taxes had never been paid in by Atrium.

30

35.     The defendants failed to pay the employer's share of the employment taxes due to the IRS for the first quarter of 2017 through the third quarter of 2018, as well as the federal unemployment taxes for 2017 and 2018.

Overt Acts

In furtherance of the conspiracy, and to accomplish its objectives, the following overt acts were committed in the Western District of Wisconsin, and elsewhere:

36.     The defendants filed Forms 941 with the IRS but did not pay over all of the income taxes and employment taxes withheld from its Wisconsin employees for the first quarter of 2017 through the third quarter of 2018.

37.     The defendants submitted Forms W-2 for 2016, 2017, and 2018 to its employees and to the IRS reflecting that the income taxes and employment taxes were withheld from its Wisconsin employees' wages, tricking the employees into believing that the withheld taxes had been paid over to the IRS and the Wisconsin Department of Revenue and thereby concealing the scheme.

38.     The defendants caused Atrium to evade the payment of the employer's share of Form 941 employment taxes and Form 940 unemployment taxes to the IRS from the first quarter of 2017 through the third quarter of 2018.

39.     The defendants caused Atrium employees in Wisconsin to falsely report on their personal income tax returns that Atrium had paid over their income tax taxes withheld from their wages, as reported on their Form W-2s from Atrium.

COUNT 12

1-26.   Paragraphs 1-26 of Count 1 are incorporated here.

31

<u>Conspiracy</u>

27.     From on or about January 1, 2015 to in or about August 2018, in the

Western District of Wisconsin, and elsewhere, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

knowingly conspired with each other, and with others known and unknown to the

grand jury, to commit and caused to be committed, the following offenses against the

United States:

a.     Knowingly conduct and attempt to conduct financial transactions

affecting interstate and foreign commerce, which involved the proceeds of a specified

unlawful activity, that is health care fraud, with the intent to promote the carrying on of

specified unlawful activity, that is health care fraud, and that while conducting and

attempting to conduct such financial transactions, knew that the property involved in

the financial transaction represented the proceeds of some form of unlawful activity in

violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b.     Knowingly engage and attempt to engage in monetary transactions

by, through, or to a financial institution, affecting interstate and foreign commerce, in

criminally derived property of a value greater than $10,000, such property having been

derived from a specified unlawful activity, that is health care fraud, in violation of Title

18, United States Code, Section 1957.

<u>Manner and Means</u>

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

28.     With some Wisconsin vendors, and national vendors servicing Wisconsin SNFs, the defendants waited until the vendor threatened to cut off the goods and services, and then issued the vendor a check which the defendants knew would bounce because there were insufficient funds in the account to cover the check.  This had the effect of stringing the vendor along to keep them supplying the goods and services on credit.

29.     With some Wisconsin vendors, and national vendors servicing Wisconsin SNFs, the defendants entered into payment plans with lulling payments as a way to avoid having vendors cut off the supply of goods and services. The defendants would make some initial payments under the plan to keep the goods and services flowing, and then stop the payments. This tactic strung along the vendors and bought the defendants more time to even out Atrium's cash flow deficiencies.

30.     The defendants made guaranteed payments to the Atrium owners. From January 1, 2015 to August 1, 2018, the guaranteed owner compensation payments totaled in excess of $37,000,000.  The defendants told Atrium's accounts payable staff these were "guaranteed payments" that had to be paid out and the accounts payable staff should consider these payments as "salaries" to the owners.

31.     Most of the owner guaranteed payments were made by wire transfer in increments over $10,000.

32.    By distributing these guaranteed payments to the Atrium owners, the defendants kept the owners satisfied with defendant BRESLIN's operational control of Atrium, and unaware of Atrium's true financial performance, and the failure to meet the statutorily-required quality of case standards, which ultimately led to a receiver being appointed to run the Wisconsin SNFs on September 7, 2018, with creditors filing unsecured claims totaling over $23,000,000.

(All in violation of Title 18, United States Code, Section 1956(h)).

<u>FORFEITURE ALLEGATION</u>

1.    Upon conviction of one or more of the offenses alleged in this indictment, the defendants,

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

shall forfeit to the United States the following:

a.    Upon conviction of Count 1 of this indictment, the defendants shall forfeit pursuant to 18 U.S.C. § 982, any property constituting or is involved in, or is derived from proceeds traceable to the offense, including a money judgment of $37,269,925 in United States currency, representing the amount of proceeds obtained as a result of health care fraud.

b.    Upon conviction of Counts 2-10 of this indictment, the defendants shall forfeit pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property constituting or is involved in, or is derived from proceeds traceable to the offense,

including a money judgment of $37,269,925 in United States currency, representing the

amount of proceeds obtained as a result of wire and mail fraud.

      c.     If any of the property described above, as a result of any act or

omission of the defendants:

> -cannot be located upon the exercise of due diligence;
> -has been transferred or sold to, or deposited with, a third party;
> -has been placed beyond the jurisdiction of the court;
> -has been substantially diminished in value; or
> -has been commingled with other property which cannot be
> divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18,

United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c)

      (In violation of Title 18, United States Code, Section 982).

A TRUE BILL

_____
PRESIDING JUROR

Indictment returned: **2/01/2023**

TIMOTHY M. O'SHEA
United States Attorney

AMANDA N. LISKAMM
Director, Consumer Protection Branch
U.S. Department of Justice
Civil Division