IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| KEVIN BRESLIN, and KBWB OPERATIONS, LLC d/b/a Atrium Health and Senior Living, | Case No. 23-cr-00010 (WMC) |
| Defendants. | |

### DEFENDANT KEVIN BRESLIN'S MOTION TO EXCLUDE GOVERNMENT EXPERT SUZANNE BESSETTE

Defendant, Kevin Breslin, by his attorney Kenneth E. Yeadon, Hinshaw & Culbertson LLP, respectfully moves this Honorable Court to bar the Government's disclosed expert, Suzanne Bessette, pursuant to F.R.E. 702, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. In the event that the Court does not bar Ms. Bessette based solely on this motion, Defendant Breslin respectfully moves the Court told hold an evidentiary hearing in order to assess whether Ms. Bessette should be permitted to testify at trial.

### I.   Introduction

The Government has disclosed Suzanne Bessette, a legal nurse consultant, as a nursing expert witness. (Ex. A, Disclosure as to Suzanne Bessette; Ex. B, Expert Report of Suzanne Bessette.) Ms. Bessette's opinions address the standard of care at co-defendant Atrium Health and Senior Living's ("Atrium") facilities, and whether or not Defendants[1] breached that standard of care.

---

[1] Defendants Breslin and Atrium are collectively "Defendants."

While her report is filled with sensational anecdotes and sweeping impressions, Ms. Bessette's conclusions are premised upon her underlying opinion that enumerated regulations and standards of care were violated by the ten facilities covered by her report.[2] (Ex. B, p. 1). Yet, in reaching this conclusion, Ms. Bessette did not conduct any independent analysis or evaluation, rather relying on and regurgitating findings made by a third party in Statements of Deficiencies.[3] Ms. Bessette likewise did not conduct any independent analysis or evaluation, or even review any records relating to residents other than the six residents identified in her report in reaching her conclusion that Defendant Breslin personally somehow breached the standard of care across all facilities during the entire relevant time period. Ms. Bessette, much like Government expert Suzanne Frederick, also reaches the opinion that Defendants breached the standard of care to provide sufficient staff with the appropriate competencies and skills sets to provide nursing care not only to these six identified residents, but again to "all" residents.

Ms. Bessette conducted <u>no</u> analysis of the actual staffing at any facility during any given time period. She does not evaluate the minimum staffing requirements and whether they were met. She does not evaluate the number of residents at any given facility and any time, the acuity of the residents at any given facility at any given time, nor what staffing levels should be. Similarly, she does not evaluate the competencies or skill sets of a single staff member in reaching her conclusion.

Ms. Bessette's analysis is not an analysis at all. It amounts to nothing more than a regurgitation of information prepared by third parties. She does not conduct her own investigation or interviews of witnesses. Rather, she merely repeats and accepts superficially anecdotal

---

[2] Two of the facilities are also covered by the expert report of Suzanne Frederick. Such expert testimony is cumulative and highly prejudicial to Defendant Breslin.
[3] These Statements of Deficiency themselves are subject to a separate Motion to Bar as hearsay and irrelevant to the charges – See Dkt. #64.

summaries of interviews prepared by state surveyors or investigating case agents. She did not conduct her own interviews of witnesses. She does not even rely on recorded statements from witnesses, or even transcripts of statements. Ms. Bessette impermissibly accepted and relied solely upon summaries of interviews conducted by third parties. This is not a reliable or even a scientific method.

While Ms. Bessette's decision to rely only upon these summaries of witness statements and to not conduct any investigation of her own is reason alone to exclude her as an expert witness, her opinions are otherwise unreliable under Rule 702. As fully discussed below, her broad opinions lack sufficient data or information (or, in some cases, sufficient qualifications) to support them, are not the product of reliable principles and methods, and provide nothing but an unsupported bottom line. She also demonstrates a clear motive to advocate, rather than provide an <u>independent</u> opinion, rendering her opinions biased and unreliable. Defendant Breslin moves to bar such opinions as wholly unreliable.

## II. Standards of Expert Opinion Admissibility

Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony in federal court. *Lewis v. CITGO Petroleum Co.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and

> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under *Daubert*, the district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission. *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). The insistence on reliability helps ensure the integrity of the judicial process and is of such transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert*. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 318 (N.D. Ill. 2008) (Cole, J.) (citations omitted). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard. F.R.E. 702; *Obrycka v. City of Chicago*, 792 F. Supp.2d 1013, 1019 (N.D. Ill. 2011) (St. Eve, J.).

When evaluating the factors bearing upon reliability under Rule 702, "the focus is not on the expert's conclusions, but on the underlying methodology." *Sommerfield,* 254 F.R.D. at 319 (citing *Daubert*, 509 U.S. at 593-95). Among the factors to consider in gauging an expert's reliability are whether: 1) the testimony relates to matters growing naturally and directly out of the research that was conducted independently from the instant litigation; 2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 3) the expert has adequately accounted for obvious alternative explanations; 4) the expert is as careful as she would be in her regular professional work outside of paid litigation consulting; and 5) the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. F.R.E. Rule 702, Advisory Committee Notes on 2000 amendments.

An expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co.,* 526 U.S. at 152. *Daubert's* framework for assessing expert testimony is applicable to social sciences, just as it

applies to experts in the hard sciences. *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). The opportunity for vigorous cross examination and the presentation of contrary evidence—the traditional and appropriate means of attacking shaky but admissible evidence—is not a basis for allowing otherwise inadmissible testimony to be admitted. *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp.2d 794, 800 (N.D. Ill. 2005).

**III.     Expert Reliance on Third Party Summaries and Data is not an Acceptable Expert Methodology and Render Ms. Bessette's Opinions Inadmissible.**

An expert's reliance on party summaries of witness statements and data is not an acceptable expert methodology. *Sommerfield*, 254 F.R.D. at 321-28 (all the opinions in the plaintiff's expert report were deemed unreliable and were excluded because they were based (in part) on a plaintiff's summaries of depositions); *See also Obrycka*, 792 F. Supp.2d at 1020-21, 1028 (plaintiff's proposed police expert excluded because he relied on certain materials provided by plaintiff's counsel which contained summaries of evidence).

Rather, "[a]n expert witness must rely on his own expertise in reaching his opinions and may not simply repeat the opinions of others." *Est. of Loury v. City of Chicago*, No. 16-cv-4452, 2019 U.S. Dist. LEXIS 38029, at *16 (N.D. Ill. Mar. 11, 2019). For example, in *Est. of Loury,* the expert witness was not an independent investigator of cases as discussed in a DOJ report, nor did he talk to anyone at the DOJ about how they arrived at their conclusion. The Court held, "To allow Clark to convey the findings of the DOJ and PATF reports without examining the processes employed in those reports and <u>parrot those findings as his own opinion about the practices of the City</u> transforms Clark's opinion into an amplifier of those reports without adding additional value for the jury's consideration." *Id*. (Emphasis added). "An expert is expected to review evidence objectively and to apply his methodology to scrutinize it and conclude based on his expertise." *Hudson v. Preckwinkle*, No. 13 C 8752, 2015 U.S. Dist. LEXIS 41981, at *38 (N.D. Ill. Mar. 31,

2015). An expert "completely abdicate[s] his role as an objective and critical analyst when he accepted without scrutiny the conclusions given to him . . ." *Id.* Similarly, "documents prepared specifically for use in litigation are 'dripping with motivations to misrepresent.'" *Sommerfield* at 318. (quoting *Hoffman v. Palmer* 129 F.2d 976, 991 (2nd Cir. 1942)).

Here, Ms. Bessette accepts wholesale summaries and materials prepared by case agents or by state surveyors, without conducting any independent investigation of her own, and repeats that information and those findings as her own. Considering it is the job of state surveyors, and even more so case agents, to prepare a basis for charges, it cannot be said that such summaries are not biased. They are unquestionably slanted with an eye towards demonstrating a basis for findings of deficiencies in the case of the state surveyors, and demonstrating a basis for criminal charges in the case of the case agents. Regardless of bias, however, such wholesale adoption of the conclusion of others, without any independent objective analysis or scrutiny renders Ms. Bessette's opinions otherwise valueless.

As shown in each of Ms. Bessette's report, aside from a brief sampling of the identified resident's medical records, she relies almost entirely on "Department of Health and Human Services Surveys" for the facility, and interviews conducted by the investigating agents. While Ms. Bessette identified select patient records for the six patients identified in her report (Ex. B, p. 2), she relies almost exclusively on these surveys and summaries of interviews. (*See*, *e.g.*, Ex. B, p. 6, n. 8; p. 9, n. 18; p. 11, n. 28; p. 12, n. 34-37; p. 14, n. 43). She fails to acknowledge that the "interviews" upon which she relies are not actual interviews, but are instead summaries of interviews prepared by investigating agents.

Not only does Ms. Bessette merely regurgitate what an interviewed witness has said, it is actually a regurgitation of yet another person's summary of what that interviewed witness

supposedly said. Ms. Frederick did not conduct any independent investigation, did not interview a single witness herself, and did not collect any reliable data to support her conclusions. Rather, in her so-called independent review, she just accepts and repeats what other witnesses have potentially said, as summarized by third parties, and states it as conclusion.

For example, Ms. Bessette concludes that the "physical plants and environment at each facility were not maintained in compliance with the standards of care" (Ex. B, p. 5-6). Ms. Bessette's basis for that conclusion is simply that "surveys and interviews depicted buildings that were in various states of disrepair." (Ex. B, p. 5). She does not form her own, independent opinion based on her own, independent investigation or analysis. Rather, she repeats the findings of the state surveyors and summaries of interviews, with zero independent review. Furthermore, she conduct no analysis whatsoever of the maintenance or upkeep of any given facility.

As a further example, Ms. Bessette concludes that Atrium (and therefore Defendant Breslin, apparently) breached the standard of care to have appropriate and necessary policies and procedures in place. Ms. Bessette reaches this conclusion based on her review of summaries of interviews of Atrium staff, which summaries were prepared by investigating agents. (Ex. B, p. 7). She does not, however, include among the documents reviewed a single policy of a single facility to evaluate whether or not such policies complied with the standard of care. Again, this wholesale adoption of summarized witness statements involves no investigation by Ms. Bessette, no analysis whatsoever, and wholly ignores data and information that is available to her.

These two examples are part of Ms. Bessette's pattern of accepting and parroting the findings made by state surveyors and summaries of witness statements as the basis for her conclusions. Ms. Bessette followed this pattern with respect to her opinions that: Atrium and its facilities breached the standards of care as they relate to infection control (Ex. B, p. 7); staffing

7

(Ex. B, p. 8); inappropriate admissions (Ex. B, p. 9); assessments and care planning (Ex. B, p. 9); prevention of abuse/neglect (Ex. B, p. 10); resident trust accounts and "deposits" (Ex. B, p. 11); emergency preparedness (Ex. B, p. 11); food and nutrition / dietary services (Ex. B, p. 12); notification of physician / family (Ex. B, p. 12); grievances (Ex. B, p. 13); unnecessary drugs (Ex. B, p. 13); and quality of care / quality of life / resident rights / dignity / administration (Ex. B, p. 13). Ms. Bessette concludes that Atrium breached the standard of care as to each of these above categories, and in each instance, in reaching such conclusion, she relies solely upon and repeated information provided by others, whether from the state surveys or from the summaries of interviews.

Given the unquestioning manner in which Ms. Bessette adopted the state surveyors' findings and conclusions as her own with no further analysis, as well as the summaries of witness statements as direct evidence as though they constitute statements themselves, none of Ms. Bessette's opinions pass muster under *Daubert*. Indeed, in concluding that certain facilities were in breach of the standard of care, she does nothing more than repeat what the state surveyors set forth in the Statements of Deficiencies, where the surveyors reached that conclusion. Relying on summaries of someone else's investigation, including summaries of witness statements rather than actual witness statements, and failing to perform any independent investigation, is an unreliable expert methodology. Ms. Bessette's testimony must be barred.

**IV.   Ms. Bessette's Opinions on "Insufficient Staffing," and Causation are Otherwise Inadmissible.**

    **A.   Summaries of Third-Party Anecdotes Cited Do Not Reliably Support Sweeping Conclusions.**

Ms. Bessette cites to the state surveys in many instances as the sole basis for her conclusions. In doing so, in every instance, she fails to cite to a single state survey for the basis of

her findings. Instead, she lumps them all together, in every single instance, referring merely to "Wisconsin DQA Surveys of Atrium Wisconsin facilities between 01/01/2015 and 09/08/2018." She refers to four years' worth of surveys at 23 different facilities, without any specific reference or analysis to a particular survey. And, aside from one single instanced where she cites to a specific report, she does this throughout her report.[4] This general reference to hundreds of reports over a four-year time period does not demonstrate any rational basis for her conclusions, even aside from the issue of adopting the conclusions within those surveys wholesale as her own and calling it expert testimony.

Likewise, Ms. Bessette reaches broad, sweeping conclusions as to Atrium and all 23 facilities based not only surveys generally, but also summaries of witness interviews, and her own prepared reports regarding 6 individual residents. She leaps to the conclusion that issues involving six residents somehow shows widespread issues across all 23 facilities, with no consideration for the number of residents cared for across all the facilities during a four year time period. She concludes, for example, that the "cumulative findings in Appendices A through F demonstrate that Atrium failed to have adequate numbers of staff with necessary competencies, training and supervision to meet the needs of Atrium residents." (Ex. B, p. 8). Aside from the fact that those appendices, each of which evaluate a single resident, do not even attempt to evaluate staffing in any manner, they do not demonstrate "widespread" concerns as Ms. Bessette suggests. In each appendix, Ms. Bessette identifies a resident, and, based on her review of records, reaches conclusions that standards of care were breached as it pertains to such things as "Pain Management," Falls," "Care Plans and Assessment" or "Isolation Precautions." (See Ex. B, Appx. A-G).

---

[4] *See* fn. 4, 8, 13, 17, 23, 28, 34, 36, 37, 39, 40, and 43.

Ms. Bessette reliance almost exclusively on anecdotal evidence does not allow her to reliably infer, nor does it demonstrate, a widespread pattern (this is especially true given the lack of any useful, statistical data as described below). As the Seventh Circuit has instructed:

> the word 'widespread' must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence that the unlawful practice was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision.

*Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). Further, "'[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion' is relevant" to considering the expert's reliability. *Kljajic v. Whirlpool Corp.*, No. 15-CV-5980, 2017 U.S. Dist. LEXIS 70784, at *43 (N.D. Ill. May 9, 2017).

The conclusions Ms. Bessette reaches in her appendices are specific to these specific residents, at these specific facilities, at these specific times. She offers no basis to extrapolate these conclusions to apply them to ALL Atrium Facilities at ALL times during the relevant time period, or to claim that such breaches were somehow "widespread." (Ex. B, p. 9, 10). Not only is this an incredibly small sampling among the hundreds to thousands of residents during the time period, her conclusion that such issues are widespread simply because these particular residents supposedly experienced them is completely unsupported.

### B. Ms. Bessette Provides No Useful Statistical Data.

In reaching her conclusion that Defendant Breslin breached the standard of care and that the most significant issue was the lack of adequate staff (Ex. A, p. 1), Ms. Bessette not only fails to provide any "useful" statistical data, but, she provides NO statistical data to support her conclusion. As with Ms. Frederick, Ms. Bessette's report does not offer a single statistic as to the number of staff employed by or actually working at any of the Atrium facilities at any given point

in time. She does not offer a single statistic as to the number of residents at any facility at any given point in time.

Ms. Bessette's opinion regarding insufficient staffing is not based on <u>any</u> data whatsoever. She employs no scientific method in reaching her conclusions and she fails to demonstrate how her "specialized knowledge," which, per her report, amounts to nothing more than what others may have said, will somehow assist the trier of fact to understand the evidence or determine a fact in issue. She relies on anecdotal evidence that, for example, one facility "did not have documentation of the rehabilitation office coordinator's competence in her job," and she extrapolates that into a conclusion of "insufficient staffing with necessary competencies." Yet she does not determine in any manner how, during this four year time period, these facilities were, in fact, staffed. Nor does she conduct any analysis of exactly how they should have been staffed. Nor does she evaluate whether any of these staffing concerns identified by surveyors and parroted by Ms. Bessette were corrected.

Likewise, Ms. Bessette opines, "The most egregious breach was the failure of Atrium to adequately fund the Wisconsin facilities from the time that they were purchased by Atrium until they were put into receivership in September 2018." (Ex. B, p. 6). This opinion is entirely unsupported. Ms. Bessette cannot support this opinion because she cannot, comment on how each of the 23 facilities were funded from 2014 to 2018. She did not review any financial data to comment on how these facilities were funded in the first place. From there, she fails to actually analyze that data to identify deficient funding, nor does she offer any opinion as to how these facilities should have been adequately funded during this time frame. This opinion is premised on nothing, is not supported by any data whatsoever, and is not the result of any analysis conducted

by Ms. Bessette. Aside from the fact that she is not qualified to render such an opinion, this opinion is completely hollow.

*Daubert* requires that an expert's testimony be "based on sufficient facts or data." Ms. Bessette does not base her opinion on <u>any</u> facts or data, and she conducts zero analysis of the sufficiency of staffing at any of these facilities. According, her testimony should be excluded.

### D. Ms. Bessette is Not Qualified to Offer Opinions as to Misappropriation of Funds or Emergency Preparedness.

Ms. Bessette was disclosed as a nursing expert. Her opinions and testimony are based on her experience "working as a nurse, supervising other nurses, and working as a consultant on the matters detailed in her curriculum vitae." (Ex. A, p. 1). She reaches her opinions allegedly based on "a reasonable degree of professional nursing certainty." (Ex. A, p. 1). Her CV, attached as Exhibit C, sets forth both an educational and work history focused on nursing. Missing from her disclosure, her report or her CV is any background that provides her a basis to offer expert testimony in the areas of misappropriation of funds or emergency preparedness. Yet she offers opinions as to these issues, despite lacking any qualifications to do so.

Ms. Bessette opines that "Atrium misappropriated resident funds held in trust." (Ex. B, p. 11). Ms. Bessette is clearly not qualified to render such an opinion. She has no accounting education or experience, and certainly no forensic accounting experience that would allow her to render such an opinion. Furthermore, just as with all of her other opinions, she does not conduct <u>any</u> investigation, analysis, evaluation or even review of financial records in reaching this conclusion. Rather, she just regurgitates the statements of someone else as her own, regardless of her lack of qualifications to opine on such matters.

Similarly, Ms. Bessette has no background in emergency preparedness. She comments that "emergency equipment was not maintained in good working order and the structure of the facilities

was in violation with applicable requirements related to fire safety and other emergencies." (Ex. B, p. 11-12). Ms. Bessette, with her nursing background, cannot possibly opine in any meaningful manner as to Atrium's maintenance of emergency equipment or the structure of the facilities. She has no background in emergency equipment, construction, emergency preparedness, or any other industry that would even hint at her being qualified to render such an opinion. Instead, as is the case throughout her report, she merely parrots statements made by others as though they are her own conclusions reached through some independent analysis that was never conducted.

### D. Ms. Bessette Advocates for the Government and Is Not an Independent Witness.

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. When weighing the *Daubert* factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). Accordingly, an expert's testimony must be objective, and not based on "subjective belief or unsupported speculation." *Daubert* at 589. Yet, here Ms. Bessette fails to remain objective, as her disclosure itself is nothing but hyperbole, intended to inflame a jury and to advocate for the Government's position.

In her disclosure, Ms. Bessette states, "Breslin and Atrium *crippled* the Atrium Nursing homes . . ." (Ex. A, p. 1)(Emphasis added). She further states, "Insufficient staff were then required to work in facilities that were dank with mold, dirty, *odorous with the smells of human waste and suffering*." (Ex. A, p. 2) (Emphasis added). Rather than maintain objectivity, Ms. Bessette uses hyperbole meant to incense and inflame the jury that has no place in expert testimony or at the trial of this matter.

V.  **Conclusion**

Ms. Bessette's "expert reports" amount to nothing more than a recitation of summaries of interviews and state survey findings and an adoption of the statements contained within as her own. She offers no analysis, no scrutiny of those findings made by surveyors, or the "statements" set forth in summaries of interviews. She does nothing more than parrot the information contained within the surveys and summaries of interviews. Not only is such information improperly considered, as noted above, it provides no value to the trier of fact.

Ms. Bessette also fails to employ <u>any</u> methodology in reaching her conclusions, as most readily demonstrated in her bald conclusion as to insufficiency of staffing despite having conducted no analysis of staffing levels and having made no determination of what appropriate staffing levels should have been. She also opines as to matters over which she has no expertise and openly advocates for the Government's position. Her disclosure and report are missing all the hallmarks of admissible expert testimony.

For the foregoing reasons, Defendant Kevin Breslin respectfully request that this Court enter an order excluding Suzanne Bessette as an expert witness, pursuant to Rule 702 and *Daubert,* if necessary, hold an evidentiary hearing, and grant any other relief the Court deems appropriate.

           Respectfully submitted,

           HINSHAW AND CULBERTSON LLP

By:   */s Kenneth E. Yeadon*
      KENNETH E. YEADON

Dated: September 4, 2024