# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| KEVIN BRESLIN, and KBWB OPERATIONS, LLC d/b/a Atrium Health and Senior Living, | Case No. 23-cr-00010 (WMC) |
| Defendants. | |

## DEFENDANT KEVIN BRESLIN'S MOTION TO EXCLUDE GOVERNMENT EXPERT SUZANNE FREDERICK

Defendant, Kevin Breslin, by his attorney Kenneth E. Yeadon, Hinshaw & Culbertson LLP, respectfully moves this Honorable Court to bar the Government's disclosed expert, Suzanne Frederick, pursuant to F.R.E. Rule 702, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. In the event that the Court does not bar Ms. Frederick based solely on this motion, Defendant Breslin respectfully moves the Court told hold an evidentiary hearing in order to assess whether Ms. Frederick should be permitted to testify at trial.

## I. Introduction

The Government has disclosed Suzanne Frederick, MSN, RN-BC, CWCN, as a nursing expert witness. (Ex. A, Disclosure as to Suzanne Frederick; Ex. B, Expert Report of Suzanne Frederick regarding Resident Robert H., Undated; Ex. C, Expert Report of Suzanne Frederick regarding Resident James S.). Ms. Frederick's opinions address the standard of care at co-defendant Atrium Health and Senior Living's ("Atrium")[1] facilities and whether Defendants

---

[1] Defendants Breslin and Atrium are collectively "Defendants."

breached that standard of care. Ms. Frederick's opinion is that Defendants breached the standard of care as to all 23 facilities, but she only analyzes whether or not the standard of care was breached at two specific facilities. Even with respect to those two facilities, Ms. Frederick's opinions are limited to two specific patients. (Ex. A, p. 1, ¶I.1-3.; See Ex. B & C generally).

While her two separate reports are filled with sensational anecdotes and sweeping impressions, Ms Frederick's conclusions are premised upon her underlying opinion that enumerated regulations and standards of care were violated by either the Appleton or Black River Falls facility with respect to patients Robert H. and James S., respectively. (Ex. B, p. 1; "Ex. C, p. 1). Yet, in reaching this conclusion, Ms. Frederick did not conduct any independent analysis or evaluation, rather relying on and regurgitating findings made by a third party as documented in Statements of Deficiencies.[2] Ms. Frederick likewise did not conduct any independent analysis or evaluation, or even review <u>any</u> records relating to other residents in reaching her conclusion that these alleged violations of the standard of care somehow placed <u>all</u> residents at <u>all</u> facilities at increased risk of harm and caused harm to them in numerous ways (while never actually identifying these supposed "numerous ways").

Ms. Frederick reaches the opinion that Defendants breached the standard of care to provide sufficient staff with the appropriate competencies and skills sets to provide nursing care not only to these two identified residents, but again to "all" residents. Yet, Ms. Frederick conducted <u>no</u> analysis of the actual staffing at any facility during any given time period. She does not evaluate the minimum staffing requirements and whether they were met. She does not evaluate the number of residents at any given facility and any time, the acuity of the residents at any given facility at

---

[2] The Statements of Deficiency are subject to a separate Motion to Bar as hearsay and irrelevant to the charges. *See* Dkt. #64.

any given time, nor what staffing levels should be. Similarly, she does not evaluate the competencies or skill sets of a single staff member in reaching her conclusion.

Simply put, Ms. Frederick's analysis is not an analysis at all. It is a regurgitation of information prepared by third parties. She does not conduct her own investigation or interviews of witnesses. She merely repeats and accepts anecdotal summaries of interviews prepared by state surveyors or investigating case agents. She did not conduct her own interviews of witnesses. She does not even rely on recorded statements from witnesses, or even transcripts of statements. Rather, she impermissibly accepted and relied solely upon summaries of interviews conducted by third parties. This is not a reliable, much less scientific, method.

While Ms. Frederick's decision to rely only upon these summaries of witness statements and to not conduct any investigation of her own is reason alone to exclude her as an expert witness, her opinions are otherwise unreliable under Rule 702. As fully discussed below, her broad opinions lack sufficient data or information (or, in some cases, sufficient qualifications) to support them, are not the product of reliable principles and methods, and provide nothing but an unsupported bottom line. Defendant Breslin moves to bar such opinions as wholly unreliable.

## II. Standards of Expert Opinion Admissibility

Federal Rules of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court. *Lewis v. CITGO Petroleum Co.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Daubert*, the district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission. *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167 (1999)). The insistence on reliability helps ensure the integrity of the judicial process and is of such transcendent importance that judges can act sua sponte to prohibit testimony that does not pass muster under *Daubert*. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 318 (N.D. Ill. 2008) (Cole, J.) (citations omitted). The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard. *Obrycka v. City of Chicago*, 792 F. Supp.2d 1013, 1019 (N.D.Ill. 2011) (St. Eve, J.).

When evaluating the factors bearing upon reliability under Rule 702, "the focus is not on the expert's conclusions, but on the underlying methodology." *Sommerfield,* 254 F.R.D. at 319 (citing *Daubert*, 509 U.S. at 593-95). Among the factors to consider in gauging an expert's reliability are whether: 1) the testimony relates to matters growing naturally and directly out of the research that was conducted independently from the instant litigation; 2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 3) the expert has adequately accounted for obvious alternative explanations; 4) the expert is as careful as she would be in her regular professional work outside of paid litigation consulting; and 5) the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. F.R.E. Rule 702, Advisory Committee Notes.

An expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co.,* 526 U.S. at 152. *Daubert's* framework for assessing expert testimony is applicable to social sciences, just as it applies to experts in the hard sciences. *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir.

1996). The opportunity for vigorous cross examination and the presentation of contrary evidence—the traditional and appropriate means of attacking shaky but admissible evidence—is not a basis for allowing otherwise inadmissible testimony to be admitted. *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp.2d 794, 800 (N.D. Ill. 2005).

### III. Expert Reliance on Third Party Summaries and Data is not an Acceptable Expert Methodology and Render Ms. Frederick's Opinions Inadmissible.

An expert's reliance on party summaries of witness statements and data is not an acceptable expert methodology. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321-28 (N.D. Ill. 2008) (all of the opinions in the plaintiff's expert report were deemed unreliable and were excluded because they were based (in part) on a plaintiff's summaries of depositions); *See also Obrycka v. City of Chicago*, 792 F. Supp.2d at 1020-21, 1028 (plaintiff's proposed police expert excluded because he relied on certain materials provided by plaintiff's counsel which contained summaries of evidence). Similarly, "documents prepared specifically for use in litigation are 'dripping with motivations to misrepresent.'" *Sommerfield* at 318. (quoting *Hoffman v. Palmer* 129 F.2d 976, 991 (2nd Cir. 1942)).

Here, Ms. Frederick readily accepted and relied upon extensive summaries and materials prepared by case agents or by state surveyors. Because it is the job of state surveyors, and case agents, to prepare a basis for charges, their summaries are biased. The summaries are slanted with an eye towards demonstrating a basis for findings of deficiencies in the case of the state surveyors and for criminal charges in the case of the case agents.

As noted in each of Ms. Frederick's reports, aside from a brief sampling of the identified resident's medical records, she relies almost entirely on "Department of Health and Human Services Surveys" for the facility, and "Department of Health and Human Services Officer of Inspector General Office of Investigations Interviews." (Ex. B, p. A-1; Ex. C, p. A-1). She does

not acknowledge that these "Interviews" upon which she relies are not actual interviews, but are instead summaries of interviews prepared by investigating agents. In fact, throughout her reports she refers to "interviews," all while actually referring to summaries of interviews prepared by third parties. (*See e.g.*, Ex. B, p. 3 – "Per the interviews, the facility admitted high acuity residents and did not have enough nurses and CNAs to care for them."; *see, e.g.*, Ex. C, p. 4 – "Based on interviews of Appleton staff discussed below, Appleton admitted high acuity residents that required a lot of care."). Not only does Ms. Frederick just regurgitate what someone else has said, she regurgitates someone else's summary of what someone else said. Ms. Frederick did not conduct any independent investigation, did not interview a single witness herself, and did not collect any reliable data to support her conclusions. Rather, she just accepts and repeats what other witnesses have potentially said, as summarized by third parties, and states it as conclusion.

Because Ms. Frederick simply adopts (and copies) the state surveyors' findings and conclusions as her own, as well as the summaries of witness statements as direct evidence as though they constitute statements themselves, none of Ms. Frederick's opinions pass muster under *Daubert*. Indeed, the suggestive information and provided conclusions in the state surveyor and investigating agents' reports touch upon every aspect of her proposed testimony, including but not limited to alleged breaches of the standard of care, the cause of those breaches, the sufficiency of staffing (which, as discussed more fully below, is not supported by <u>any</u> underlying data or analysis), reporting and investigations. Exclusively relying on state surveyors and investigating agents to form and flesh out opinions and identify supporting bases is an unreliable expert methodology. Her testimony must be barred.

## IV. Ms. Frederick's Opinions on "Insufficient Staffing," and Causation are Otherwise Inadmissible.

### A. Summaries of Third-Party Anecdotes Cited Do Not Reliably Support Sweeping Conclusions.

With respect to residents Robert H. and James S, Ms. Frederick reaches the conclusion that "It is my opinion that insufficient staffing was a significant contributor to the pattern of substandard care . . ." (Ex. B, p. 11; Ex. C, p. 13). She purports to reach this conclusion "to a reasonable degree of nursing certainty." (Ex. B, p. 11; Ex. C, p. 13). Ms. Frederick also makes the sweeping conclusion that "Insufficient staffing was the root cause of all of the nursing staff's failures of care." (Ex. B, p. 2; Ex. C, p. 3). Nevertheless, Ms. Frederick conducted <u>zero</u> analysis of the staffing at any facility at any given time and based her conclusions on the analysis of a single resident.

For example, with respect to her report relating to resident James S., Ms. Frederick reaches the conclusion that "Atrium purposefully understaffed the facility and did not provide a competitive wage for nurses and CNAs." (Ex. C, p. 3). She asserts that "Appleton failed to ensure that agency nurses were competent to perform needed skills on residents," and gives an example of understaffing where a nurse "caused trauma and bleeding when placing a Foley catheter in [James S.]." (Ex. C, p. 3). Yet, she does not rely on any evaluation of that nurse's education, training, work experience or other credentials to reach this conclusion. Rather, she relies on summaries of statements of other witnesses to somehow create this connection. Ms. Frederick also states, "Based on [summaries of] interviews of Appleton staff discussed below, Appleton admitted high acuity residents that required a lot of care." (Ex. C, p. 4). To be clear, Ms. Frederick does not offer any analysis of the number of residents, let alone the acuity of those residents, during any specific time frame to support this conclusion. She relies entirely on these summaries of anecdotal statements by witnesses.

Ms. Frederick devotes two pages to reciting agent summaries of witness statements to supposedly support her conclusions, including:

- "A resident told the surveyor that the facility was very short of help" (Ex. 3, p. 5)

- "Staff told the surveyor that showers did not get completed on scheduled days because there was not enough staff" (Ex. 3, p. 5)

- "Residents told the surveyor that the staff would 'Shut off call light and forget about you.'" (Ex. 3, p. 5)

- "I reviewed multiple [summaries of] interviews of Appleton staff members. The information obtained from the [summaries of] interviews supported my opinions regarding Atrium and Appleton's failures to meet the standard of care as well as federal and state regulations . . ." (Ex. 3, p. 5)

- "Day shifts nurses were assigned 15-30 residents each." (Ex. 3, p. 6, citing report of interview of Agency Nurse Elson).

- "There was often only one Atrium employee, with all other floor staff being from an agency." (Ex. 3, p. 6, citing report of interview of Agency Nurse Elson).

- "Appleton was constantly short-staffed." (Ex. 3, p. 6, citing report of interview of CAN Keene).

- "Short staffing resulted in call bells not being answered for long periods, toileting not getting done and short cuts being taken with patient cares." (Ex. 3, p. 6, citing report of interview of CAN Dominowski).

- "Atrium failed to provide a clean, safe environment . . ." (Ex. 3, p. 6, citing report of interview of Maintenance Director Deren).

That is the extent of data relied upon by Ms. Frederick and analysis conducted by Ms. Frederick in reaching her conclusion in that section of her report that the facility was insufficiently staffed. She relies on otherwise unreliable third-party summaries of witness statements, while failing to conduct any independent analysis or investigation of her own. She accepts these summarized statements without question, and without testing in any manner their accuracy. She does nothing more than repeat what other witnesses have supposedly said, and adopt those

statements as her own conclusion. At bottom, she offers nothing more to aid the trier of fact other than parroting what other witnesses have said.

Ms. Frederick's report for resident Robert H. has the identical, flawed methodology. She relied solely on summaries of anecdotal statements made in interviews, and just recites what was contained in those reports and adopts those conclusions as her own, without any independent investigation or analysis of her own, including:

- "Atrium purposefully understaffed the facility and did not provide a competitive wage for nurses and CNAs." (Ex. B, p. 3, citing report of interview of RN Hawley).

- ". . . the facility had a difficult time retaining staff and hiring new staff. The facility had to use agency staff, which contributed to a lack of continuity of care." (Ex. B, p. 3, citing report of interview of RN Graf).

- "Agency staff did not receive training or adequate information regarding facility policies and operations." (Ex. B, p. 3, citing report of interview of RN Graff) (NOTE: Ms. Frederick does not evaluate in any respect what training or information agency staff received, nor the policies and operations of the facility).

- "Per the [summaries of] interviews, the facility admitted high acuity residents and did not have enough nurses and CNAs to care for them." (Ex. B, p. 3).

As with her report relative to resident James S., that is the extent of data or information relied upon by Ms. Frederick and the analysis conducted by Ms. Frederick in reaching her conclusion in that section of her report that the facility was insufficiently staffed. Again, she fails to conduct any independent analysis or investigation of her own, such as, as noted above, how and when agency staff were employed, what training or information they received, what their qualifications or training were, the census or acuity of the facility's resident population, or even the actual staffing of the facility at any given point in time. While Ms. Frederick reviewed medical records of Robert H. and James S., those records naturally do not speak to the staffing levels of the facility nor to the competencies or training of the staff providing cares.

In both reports, Ms. Frederick accepts these summarized statements in whole and without question. She does not conduct any <u>independent</u> investigation or analysis that would be at the heart of any allowable expert testimony. And yet, she nonetheless makes the leap from this "analysis" amounting to nothing more than summaries of anecdotal witness statements to the conclusion "Insufficient staffing was the root cause of **all** the nursing staff's failures of care." (Ex. B, p. 2)(Emphasis added), or that "Atrium **purposefully** understaffed the facility and did not provide a competitive wage for nurses and CNAs." (Ex. C, p. 3) (emphasis added). Ms. Frederick uses hyperbole as "It is my opinion that this situation was caused by Atrium's purposeful pattern of insufficient staffing," and relies on nothing more to support this claim than statements supposedly made by other witnesses. (Ex. C, p. 9). An expert must rely on scientific method and not "subjective belief or unsupported speculation." *Daubert*, 509 U.S. 589. Yet that is all we get here —subjective belief and unsupported speculation based on statements that others may have made. There is simply no support for these sweeping conclusions, and her testimony must be excluded on this basis alone.

  **B.**  **Ms. Frederick Provides No Useful Statistical Data.**

In reaching her conclusion, identical in the two reports, that "insufficient staffing was a significant contributor to the pattern of substandard of care of" the resident, Ms. Frederick fails to provide any "useful" statistical data, and provides NO statistical data to support her conclusion. She relies solely on agent-prepared summaries of anecdotal statements given by witnesses. Missing from her analysis in reaching her conclusion that these two facilities were not sufficiently staffed is any data or analysis relating to: (1) what was the actual staffing at any given period of time; (2) what was the minimal requirement for staffing the facility at any given time; (3) what was the census of the facility at any given time and how would that have impacted the required

staffing; (4) what was the acuity of the resident population and how would that have impacted the required staffing; (5) what were the credentials of the staff on site at any given period of time; or (6) what should the staffing have been at any particular facility at any given period of time. This is all information that would be expected to be part of any analysis in reaching the conclusion that a facility was "insufficiently staffed." Yet none of this data or analysis is present here.

Ms. Frederick reaches conclusions such as "Black River Falls did not have sufficient staff to ensure that [Robert H.] receive the necessary care and services . . ." (Ex. B, p. 4). Yet she does not identify what staff it had at the facility during the time that Robert H. was there, the competencies of the staff or training that those nurses received, why it was insufficient, or how Black River Falls should have staffed the facility in order to meet this standard. Similarly, Ms. Frederick opines, "Black River Falls did not have enough CNAs to provide the care that [Robert H.] and the other residents needed." (Ex. B, p. 4). Yet, she fails to identify anywhere in her report how many CNAs they did have, or how many CNAs were needed, whether for Robert H. or for the "other residents." The analysis is not simply lacking or wanting. Rather, the analysis simply is not there.

In fact, neither of Ms. Frederick's reports offers a single statistic as to the number of staff employed by or actually working at either of the two Atrium facilities at any given point in time. She does not offer a single statistic as to the number of residents at either facility at any given point in time. Her opinion regarding insufficient staffing is not based on <u>any</u> data whatsoever. She employs no scientific method in reaching her conclusions and she fails to demonstrate how her "specialized knowledge," which, according to her report, amounts to nothing more than what others may have said, will somehow assist the trier of fact to understand the evidence or determine a fact in issue. Simply put, where *Daubert* requires that an experts testimony be "based on

11
1027201\322064762.v1

sufficient facts or data," and Ms. Frederick does not base her opinion on <u>any</u> facts or data, there is simply no basis to allow her otherwise inadmissible testimony.

C. **Ms. Frederick Fails to Account for Obvious Alternative Explanations.**

Ms. Frederick's opinions appear to be that, because these two facilities were insufficiently staffed, these two patients did not receive adequate care. As noted by the Advisory Committee in its notes to Rule 702, in gauging an expert's reliability, one factor to consider is whether "the expert has adequately accounted for obvious alternative explanations." F.R.E. Rule 702, Advisory Committee Notes. Here, Ms. Frederick makes no attempt whatsoever to account for alternative explanations as it relates to any breaches of care regarding residents Robert H. or James S. For example, Ms. Frederick opines that "Appleton and its nurses breached the standard of care by failing to monitor [James S.'s] drug regimen." (Ex. 3, p. 6). She further notes that "[t]he nurses failed to adequately assess and document [James S.'s] response to his medication regime" and that "a nurse contacted the wrong doctor . . . about Diazepam, causing [James S.] to be too drowsy." (Ex. C, p. 7). She also notes that the nurses failed to recognize an emergency, "should have immediately called the physician and request transfer to a higher level of care, the hospital," and "failed to do this." (Ex. C, p. 7). James S. was hospitalized, and Ms. Frederick concludes, "It is my opinion that this situation was caused by Atrium's purposeful pattern of insufficient staffing." (Ex. C, p. 9).

Yet, Ms. Frederick does not address or even acknowledge <u>any</u> alternative explanations. Two obvious ones bear addressing – that this situation was not caused by lack of staffing but rather by negligence on the part of staff. She fails to recognize whether or not it is possible that even if this facility were sufficiently staffed at this time, this situation could nonetheless have been caused by carelessness or negligence by the staff. She fails to recognize that this situation may have happened regardless of staffing, or account for this obvious alternative explanation. She leaps to

12

the conclusion that there was a "purposeful pattern of insufficient staffing," without ever building the necessary bridge to reach that conclusion. This is just another example of the shortcomings of Ms. Frederick as an "expert" witness, and another reason her testimony should be excluded.

## V. Conclusion

Ms. Frederick's "expert reports" amount to nothing more than a recitation of summaries of interviews and state survey findings and an adoption of the statements contained within as her own. She offers no analysis, claiming, among other things, that a particular facility was understaffed because investigators said that witnesses said so. She makes no independent determination of the sufficiency of staffing, with no analysis whatsoever of just how these facilities were staffed, how they should have been staffed or the training received by staff. She offers no analysis as to the cause of the breaches of the standards of care, but rather only hollow conclusions supported only by summaries of anecdotal witness statements. She offers no "underlying methodology" in reaching her conclusions, and she has conducted no independent investigation or analysis. In this respect, her testimony offers nothing to aid the trier of fact. Her testimony is not "based on sufficient facts or data," is not "the product of reliable principles and methods," and she has not "applied the principles and methods reliable to the facts of the case." Simply put, her report and her anticipated testimony do not pass muster under the *Daubert* standard.

For the foregoing reasons, Defendant Kevin Breslin respectfully request that this Court enter an order excluding Suzanne Frederick as an expert witness, pursuant to Rule 702 and *Daubert*, if necessary, hold an evidentiary hearing, and grant any other relief that this Court deems necessary.

Respectfully submitted,

HINSHAW AND CULBERTSON LLP

By: */s Kenneth E. Yeadon*
     KENNETH E. YEADON

Dated: September 4, 2024