UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

       v.                                  Case No.  23-cr-10-WMC

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

                Defendants.
_____/

## GOVERNMENT'S RESPONSE IN PARTIAL OPPOSITION TO DEFENDANT KEVIN BRESLIN'S MOTION TO BAR CERTAIN TESTIMONY FROM GOVERNMENT EXPERT MICHAEL D. PAKTER

The United States of America, by and through undersigned counsel, respectfully submits this response in partial opposition to defendant Kevin Breslin's Motion to Bar Certain Testimony From Government Expert Michael D. Pakter ("motion") [Doc. 93]. As grounds for this opposition, the United States relies on the following points and authorities.

## BACKGROUND

The government intends to offer the testimony of Michael D. Pakter, a certified public accountant, as a financial expert. Mr. Pakter is a Certified Public Accountant, with certifications in Financial Forensics, Valuation, Insolvency and Restructuring, Fraud Examination, and Distressed Business Valuation, with more than forty-five years of experience. [Ex. 1 at 6]. His past work includes varied and vast experience in the realms of forensic accounting, business economics, economic damages, and business valuations as demonstrated by his Curriculum Vitale. Most relevant to defendant's motion is Mr. Pakter's experience with forensic accounting, which involves evaluating the effect of certain financial transactions. Mr. Pakter has not only been certified by the Association of International Certified Professional Accounts in Financial Forensics since 2008,

1

but also has earned from the National Association of Certified Valuators and Analysts the designation of Master Analyst in Financial Forensics. But his experience is not limited to training and certifications alone. Mr. Pakter has previously assisted in identifying cash disbursements of a company's owner, investigated and identified disbursements of an executive director, and submitted at least two expert reports involving the tracing of cash disbursements. This experience, in combination with his experience in accounting, business economics, and investigations, as well as his many certifications, make him uniquely qualified to opine on not only cash disbursements, but also their effect on a business's financial solvency and ability to meet operational needs.

On July 22, 2024, the government disclosed to defendants Kevin Breslin ("Breslin") and KBWB Operations, LLC ("KBWB") the expert report of Mr. Pakter. On September 4, 2024, defendant Breslin filed a motion to preclude Mr. Pakter from testifying regarding the following two bolded and underlined opinions:

> Defendants diverted and disbursed multiple millions of dollars in distributions and/or guaranteed payments to non-patient care areas – to the Owners of KBWB Parent; to pay Elia Zois' personal expenses; to a related party, "KZ Corp."; to return capital to the Investors in B-Well; and to construct, develop, and/or acquire additional facilities. **<u>Defendant Breslin prioritized these disbursements ahead of the necessary clinical and operational patient-care needs of the Wisconsin facilities and its residents. These disbursements of multiple millions of dollars were not available for the care of and deprioritized the care of the patients in the Wisconsin facilities.</u>** These multiple millions of dollars were disbursed at a time when KBWB Parent was experiencing financial distress indicated by its negative shareholders' equity, and/or the nature, timing, and extent of its increasing debt and worsening cash flows.[1]

[Doc. 91 at 4]. *See also* Motion at 2.

> Overall, KBWB struggled to pay its vendors, **<u>ultimately causing their facilities to not regularly receive the sufficient materials or services needed to provide acceptable patient care.</u>** The turnover rate, which measures how efficiently a company is paying its suppliers, indicating a decreasing range.

---

[1] This underlined opinion is repeated word for word on page 66 of Mr. Pakter's expert report, which is also cited in defendant's motion.

[Doc. 91 at 46]. *See also* Motion at 2.

On September 11, 2024, the government disclosed to defendants Breslin and KBWB Operations, LLC, Mr. Pakter's amended expert report, which clarified the wording of the opinions that are the subject of defendant Breslin's motion.[2] *See* Exhibit 1, Amended Expert Report. The amended report removes references to what is necessary and acceptable patient care. The amended portions of his report, bolded and underlined below, now state as follows:

> Defendants diverted and disbursed multiple millions of dollars in distributions and/or guaranteed payments to non-patient care areas – to the Owners of KBWB Parent; to pay Elia Zois' personal expenses; to a related party, "KZ Corp."; to return capital to the Investors in B-Well; and to construct, develop, and/or acquire additional facilities. Defendant Breslin prioritized **making the above listed disbursements ahead of making other disbursements for the Wisconsin facilities. The above listed disbursements of multiple millions of dollars to non-patient care areas reduced the funds available for the Wisconsin facilities.** These multiple millions of dollars were disbursed at a time when KBWB Parent was experiencing financial distress indicated by its negative shareholders' equity, and/or the nature, timing, and extent of its increasing debt and worsening cash flows.[3]

[Ex. 1 at 4, 66]. As for the second bullet, Mr. Pakter's report opines that:

> Overall, KBWB struggled to pay its vendors, **which caused the Wisconsin facilities difficulty in obtaining goods and services.** The turnover rate, which measures how efficiently a company is paying its suppliers, indicated a decreasing range.

[Ex. 1 at 46].

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rules of Evidence 702. *United States v. Johnson*, 916 F.3d 579, 586 (7th Cir. 2019). To be admissible under Rule 702, "expert testimony

---

[2] No other changes were made to his amended report. *See* Exhibit 1.
[3] This opinion is repeated word for word on page 66 of Mr. Pakter's expert report, which is also cited in defendant's motion.

must assist the trier of fact and demonstrate sufficient reliability." *Id*. Under *Daubert*, trial courts act as gatekeepers to ensure "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *Johnson*, 916 F.3d at 586. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The soundness of the factual support of the expert witness's analysis and whether the expert's conclusions based on that analysis is correct is to be determined by the trier of fact. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony: (1) whether the witness is qualified; (2) whether the witness's methodology is scientifically reliable; and (3) whether the witness's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (cleaned up). In assessing whether an individual witness is qualified, the Seventh Circuit does not ask "whether an expert 'is qualified in general' but whether he is qualified 'to answer a specific question[.]" *United States v. Truitt*, 938 F.3d 885, 899 (7th Cir. 2019) (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). Therefore, the court looks to "each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617.

The purpose of the court's inquiry is to scrutinize proposed expert witness testimony to determine if it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and is thus reliable enough to present to a jury. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The proponent of the expert bears the burden of demonstrating, by a preponderance of the evidence, that the expert's testimony would satisfy the *Daubert* standard. *Lewis v. CITGO*

*Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendments); accord *Downing v. Abbot Laboratories*, 48 F.4th 793, 809 (7th Cir. 2022).

## ARGUMENT

Defendant Breslin argues that Mr. Pakter is not qualified to opine about clinical and operation needs of nursing home facilities and the care of patients. Motion at 3. Defendant Breslin also argues, "by extension," that Mr. Pakter is "unqualified to opine about what funds, materials, or services were necessary to provide this care or to satisfy these clinical and operational needs." *Id.* at 4. Defendant Breslin's first argument is moot because the government does not intend to elicit testimony from Mr. Pakter on acceptable patient care or the standards of care for nursing homes. Mr. Pakter, in his amended report, has clarified his opinion which does not include <u>necessary clinical and operational patient-care needs</u>:

> Defendants diverted and disbursed multiple millions of dollars in distributions and/or guaranteed payments to non-patient care areas – to the Owners of KBWB Parent; to pay Elia Zois' personal expenses; to a related party, "KZ Corp."; to return capital to the Investors in B-Well; and to construct, develop, and/or acquire additional facilities. Defendant Breslin prioritized **<u>making the above listed disbursements ahead of making other disbursements for the Wisconsin facilities. The above listed disbursements of multiple millions of dollars to non-patient care areas reduced the funds available for the Wisconsin facilities.</u>** These multiple millions of dollars were disbursed at a time when KBWB Parent was experiencing financial distress indicated by its negative shareholders' equity, and/or the nature, timing, and extent of its increasing debt and worsening cash flows.

[Ex. 1 at 4, 66].

Mr. Pakter is qualified to testify about funds, or the lack thereof, and the impact on the materials, operations, and services for the Atrium Wisconsin facilities. Therefore, defendant Breslin's second argument for exclusion of Mr. Pakter's testimony is without merit and should be denied.

5

Mr. Pakter is qualified to opine that disbursement and distribution of funds to defendant Breslin and other owners of KBWB ultimately resulted in a reduction in available funds for the Wisconsin facilities, including funds available to obtain goods and services. Mr. Pakter is a Certified Public Accountant with more than forty-five years of experience. [Ex. 1 at 6]. Not only has Mr. Pakter been certified in Financial Forensics since 2008, but he has also earned the designation of Master Analyst in Financial Forensics. In past engagements, Mr. Pakter has assisted in identifying cash disbursements of a company's owner, investigated and identified disbursements of an executive director, and submitted at least two expert reports involving the tracing of cash disbursements. These experiences allow him to evaluate the effect of certain financial transactions, which is exactly the type of work he did in his expert report. As discussed above, in more detail, Mr. Pakter has the necessary experience and training to perform forensic accounting to identify cash disbursements and the disbursement's impact on the funds available for other operational costs borne by the Wisconsin facilities. Because of these qualifications, the opinions directly addressed by defendant's motion should not be struck wholesale by the Court.

Mr. Pakter's original report unintentionally relayed an opinion about patient care. Mr. Pakter clarified the wording of these opinions for the sole purpose of removing any opinion regarding necessary or acceptable patient care. Instead, his opinions focus on the lack of funds to pay for operational costs of the facilities due to the disbursements to defendant Breslin and the other KBWB owners.

As explained in *Truitt*, the court must ask if Mr. Pakter is qualified to answer a *specific question*. 938 F.3d at 899 (emphasis added). The specific question at issue here is whether the disbursement or distributions of guaranteed payments to KBWB's owners resulted in a lack of funding for the operational needs and services of the Atrium Wisconsin nursing facilities. The

court then looks to the expert's conclusions and determines if "he has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617.

Mr. Pakter's conclusions, as reproduced in whole above, focus on (1) prioritization of funding and (2) lack of funding to meet operational needs. Mr. Pakter's extensive forty-five years of experience in accounting and forensic accounting, business economics and investigations, professional and work experience, which defendants do not challenge, make him uniquely qualified to opine on how the diversion of funds to the Atrium owners meant those funds "reduced the funds available for the Wisconsin facilities" and contributed to the financial distress experienced by the facilities. [Ex. 1 at 4]. Mr. Pakter is *not* opining on where the money should have gone to successfully run a nursing home. Instead, he is opining that the disbursements to owners were prioritized above disbursements to the Wisconsin facilities, and likewise reduced the funds available for operation of the Wisconsin facilities.

Mr. Pakter's certifications and past work experiences give him "the adequate education, skill, and training to reach" these conclusions. *Gayton*, 593 F.3d at 617. Mr. Pakter's background includes multiple engagements for his accounting and forensic accounting expertise, which gives him experience in evaluating revenues, expenses, cash flows, and the effect of financial transactions on a business. These experiences, certifications, and previous engagements make him a credible expert in his field and support his conclusions regarding the lack of funding available for the Wisconsin facilities due to the disbursements made by Atrium owners, including defendant Breslin.

To reach these conclusions, Mr. Pakter reviewed and analyzed KBWB's assets, liabilities, revenues, operating expenses, income, cash flows, and other financial data, among other documents. As explained clearly in Mr. Pakter's expert report, funds were diverted from numerous

sources, including Medicare and Medicaid, employees' health insurance and 401(k) plans, resident trust accounts, and non-payment of vendors and required taxes, among others. *See e.g.,* Ex. 1 at 22-46. Mr. Pakter then explains that *instead of* using funds to meet these operational costs and legal obligations, the owners of KBWB, including defendant Breslin, received guaranteed distributions totaling 55 million dollars, and further diverted other funds for the development of Atrium's New Jersey facilities. Based on Mr. Pakter's training, education, and experience, he is qualified to testify on these topics.

WHEREFORE, based on the foregoing, the government respectfully requests that the defendant's Motion to Exclude Government Expert Michael D. Pakter be denied.

Respectfully submitted,

TIMOTHY M. O'SHEA
UNITED STATES ATTORNEY

AMANDA N. LISKAMM
DIRECTOR
CONSUMER PROTECTION BRANCH
U.S. DEPARTMENT OF JUSTICE

/s/ *Rowan L. Reid*
Karla-Dee Clark
Steven R. Scott
Rowan Reid
Trial Attorneys
U.S. Department of Justice
Consumer Protection Branch
450 Fifth Street, NW, Suite 6400S
Washington, D.C. 20001
Clark (202) 532-4098; Scott (202) 286-5293; Reid (202) 532-4315
Karla-Dee.Clark@usdoj.gov;
Steven.R.Scott@usdoj.gov;
Rowan.L.Reid@usdoj.gov