# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

      v.                                   Case No. 23-cr-10-WMC

KEVIN BRESLIN and
KBWB OPERATIONS, LLC d/b/a
Atrium Health and Senior Living,

            Defendants.
_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT KEVIN BRESLIN'S MOTION TO EXCLUDE GOVERNMENT EXPERT SUZANNE BESSETTE

The United States of America, by and through undersigned counsel, respectfully submits this response in opposition to defendant Kevin Breslin's Motion to Exclude Government Expert Suzanne Bessette ("Motion") [Doc. 82]. As grounds for this opposition, the United States relies on the following points and authorities.

## GOVERNMENT'S PROPOSED EXPERT

The government intends to offer the testimony of Suzanne Bessette as a nurse expert in the nursing industry. Ms. Bessette's testimony will include the standards of care and rules and regulations, and non-compliance therewith for Atrium facilities in Wisconsin. Ms. Bessette will rely on her experience, education, and training as a basis for her testimony.

Ms. Bessette has over 50 years' experience in the nursing industry that includes working in nursing facilities and with the standards of care and rules and regulations. For approximately 20 years she was a registered nurse and worked in five states, namely Massachusetts, Rhode Island, Florida, Louisiana, and California. During those years, she worked in a skilled care nursing home,

1

nursing homes, and hospitals in various roles including nurse assistant, staff nurse, assistant director of nurses, and director of nurses.

As a nurse assistant, her work included daily care of residents, conducting socialization and activities with residents, and assisting with activities of daily living. As a staff nurse, she administered medications to residents, performed treatments for residents, and supervised other personnel including licensed practical nurses and nurse assistants. Ms. Bessette, as an assistant director of nursing, worked with the hospital administrator and heads of departments in establishing staffing ratios and levels as new areas opened for a hospital that was being built; wrote policy and procedure manuals on topics including staffing, general nursing, infection control, and transfers and discharges; wrote policy and procedure manual for the emergency department; and oversaw the ordering of medical supplies and equipment for areas of the hospital including recovery, pediatrics, medical/surgical units, and obstetrics and gynecology. Ms. Bessette also worked as a field nurse supervisor. In that position, she supervised licensed practical nurses, registered nurses, and nurse assistants. She conducted a review of records to determine the appropriate services needed and assessed care and activities of daily living and conducted initial assessments of perspective clients. Ms. Bessette also initiated the process for review of complaints and conducted the complaint review process and ensured there were adequate medical supplies and equipment, and materials.

As director of nursing at a long-term skilled care facility, Ms. Bessette oversaw the nursing staff, developed and participated in the review of care plans for residents and oversaw implementation of those care plans, assessed residents and resident care, and worked with the corporate regional manager and the administrator to establish staffing patterns, and maintained daily staffing levels. She oversaw quality assurance and infection control, reviewed the infections

and where they were located, looked for trends, patterns, and type of organism, and how it spread. In addition, she conducted daily assessments of residents, resident care, and of the facility environment for safety and cleanliness. Ms. Bessette communicated with maintenance staff about repairs and replacement of items inside and outside the facility. For emergency preparedness, she ensured staff knew and participated in drills to make sure the facility was prepared for an emergency, and checked for fire safety and other safety mechanisms including alarm doors.

Ms. Bessette is currently and for the past 32 years has been the President of AFH, Inc., a nurse consultant company, and works on nursing home cases. She oversees a team of clinicians that includes a nursing home administrator, registered nurses, a registered dietician, and a physician, all who have numerous years of experience in the fields of nursing care, nursing homes, skilled nursing facilities, and/or experience in the care of disabled and senior individuals. Her consulting work includes nursing services, failures of care cases, review and analysis of medical records and documents, facility documents, analysis of archived data from the Centers for Medicare & Medicaid Services ("CMS"), data from the Center for Health Systems Research and Analysis ("CHSRA"), and the Online Survey Certification and Reporting System ("OSCAR"). Ms. Bessette's extensive experience is reliable and sufficient and is the basis for her opinions in this case.

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. *United States v. Johnson*, 916 F.3d 579, 586 (7th Cir. 2019). To be admissible under Rule 702, "expert testimony must assist the trier of fact and demonstrate sufficient reliability." *Id.* Under *Daubert*, trial courts act as gatekeepers to ensure "that any and all scientific testimony or evidence admitted is not only

relevant, but reliable." 509 U.S. at 589; *Johnson*, 916 F.3d at 586. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The soundness of the factual support of the expert witness's analysis and whether the expert's conclusions based on that analysis is correct is to be determined by the trier of fact. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony: (1) whether the witness is qualified; (2) whether the witness's methodology is scientifically reliable; and (3) whether the witness's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (cleaned up). In assessing the reliability of expert testimony, the Supreme Court set forth the following five guiding factors: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique or method has been met with general acceptance. *Daubert*, 509 U.S. at 593-94. These *Daubert* factors should not be considered "a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge." *U.S. v. Conn*, 297 F.3d 548, 556-57 (7th Cir. 2002). The district court may use the *Daubert* factors as a point of departure and "is free to fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *Id*. at 556. It should consider the expert witness's training and experience, and the methodology employed to arrive at a conclusion. *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). The district court has broad latitude to determine how to measure the reliability of a proposed expert's testimony and whether it is in fact reliable. *Id*. It is such broad latitude that

permits a district court to decide whether to apply at all any of the *Daubert* factors in every case. "[T]he law grant the trial judge broad latitude to determine . . . [whether] *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137,153 (1999).

Reliability under Rule 702 requires the district court to determine only that the expert is providing testimony based on a reliable methodology correctly applied and the expert considered sufficient data to use the methodology. *Stollings v. Ryobi Technologies*, 725 F.3d 753, 766 (7th Cir. 2013). Criticisms regarding the quality of testimony, soundness of the factual basis and correctness of an expert's conclusions go to the weight of the expert's testimony which a district court should permit a jury to decide. *Id*. The purpose of the court's inquiry is to scrutinize proposed expert witness testimony to determine if it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and is thus reliable enough to present to a jury. *Kumho Tire Co. Ltd.*, 526 U.S. at 152.

Experience is a reliable basis for an expert opinion. Fed. R. Evid. 702 advisory committee note to 2000 amendments. When this is the situation, the witness "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. Expert testimony based on experience has been found to be reliable and admissible. *United States v. Esformes*, 60 F.4th 621, 637 (11th Cir. 2023) (expert qualified to testify about skilled nursing facility practices based on his experience and education, and his testimony was reliable even though he did not do any testing or use scientific methods); *United States v. Lang*, No. 2015-0013, 2016 WL 1734087, at *6 (D.V.I. Apr. 28, 2016) (expert's testimony reliable that was based on more than 30 years' experience working in the field of forensic science); *Cage v. City of Chicago*, 979 F.Supp.2d 787, 802-04

5

(N.D. Ill. 2013) (citing cases); *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (Rule 702 contemplates admission of expert testimony based solely on experience).

In determining whether expert testimony is relevant, the district court asks whether it will assist the trier of fact to reach a conclusion on any factual issue involved in the case. Fed. R. Evid. 702; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *Kumho Tire*, 526 U.S. at 147-49. Because the touchstone of admissibility under Rule 702 is helpfulness to the jury, *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), an expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion. *Id*. The district court must determine whether the proposed expert witness's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999).

Admissibility determinations "should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) ("*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence . . . the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable."). Thus, the rejection of expert testimony is the exception, not the rule, and the trial court's role as a gatekeeper is not intended to replace the adversary system. Fed. R. Evid. 702, advisory committee note to 2000 amendments. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The

proponent of the expert bears the burden of demonstrating, by a preponderance of the evidence, that the expert's testimony would satisfy the *Daubert* standard. *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendments); accord *Downing v. Abbot Laboratories*, 48 F.4th 793, 809 (7th Cir. 2022).

## ARGUMENT

**I.     Ms. Bessette's Should Be Permitted To Testify As An Expert Witness**

The defendant moves to exclude Suzanne Bessette from testifying as an expert witness on the grounds that she (1) used an unreliable methodology by improperly relying upon third party summaries of witness statements and state survey reports and adopting those summaries as her opinion instead of conducting an independent investigation and analysis; (2) has conclusions based on anecdotal evidence, primarily consisting of reliance on state survey reports, and failed to support her opinions regarding breaches of the standards of care; (3) failed to use any staffing statistical data to support her conclusions regarding insufficient staffing; (4) did not provide support for her opinion that the Atrium Wisconsin facilities were inadequately funded; (5) is not qualified to offer an opinion on misappropriate of funds or emergency preparedness of the Atrium Wisconsin facilities; and (6) has not maintained objectivity and is an advocate for the government's position.  The defendant's arguments are without merit and should be denied.

Ms. Bessette's testimony will be based on her over 50 years of experience in the nursing field which includes over 15 years working in the nursing profession in various capacities including as a nurse, assistant director of nursing, director of nursing in nursing homes, and in supervisory positions in the health care field.  In addition, she has provided expert consulting services to various state and federal judicial departments, the Department of Justice, the AARP, and law firms.  During the past 30 years she has been a presenter at various events and seminars

on topics including review and evaluation of nursing home cases and the standards of care, elder abuse, analyzing clinical records, and abuse and neglect in a nursing home. Ms. Bessette's extensive experience qualifies her to testify regarding the standards of care and rules and regulations and non-compliance therewith, and the nursing industry. *See* Fed. R. Evid. 702 (a witness may be qualified as an expert by experience); *Kumho*, 526 U.S. at 152 (expert testimony can be based on "professional studies or personal experience"); *Conn*, 297 F.3d at 556 (genuine expertise may be based on experience or training); *United States v. Rollins*, 862 F.2d 1282, 1293 (7th Cir. 1988) (expert opinion may be based on his or her extensive training and experience).

### A. Ms. Bessette May Rely Upon Hearsay Evidence When Forming Her Opinions

Ms. Bessette's proffered expert testimony will be based on her review of numerous records including (1) Archived CMS data from 2015-2018; (2) data from CHSRA Reports; (3) extensive medical records for residents at the Atrium Wisconsin facilities in Point Click Care ("PCC") from January 1, 2015 to September 7, 2018; (4) transfer logs; (5) emails relating to resident care, supplies, census, staffing, management, and maintenance at the Atrium Wisconsin facilities; (6) Wisconsin Department of Health Services Division of Quality Assurance Statement of Deficiencies ("SODs") and Plans of Corrections ("POCs") for Atrium Wisconsin facilities (January 1, 2015 through September 7, 2018); (7) 46 witness interview reports, some with attached photographs, emails, and documents; and (8) the federal requirements and regulations.

The Archived CMS data included the provider number, address and ownership, the participation start date, fines, quality indicator scores, the overall five-star rating, the five-star rating for surveys, staffing, and quality measures and the combinations of the five-star ratings, and actual staffing data for each facility on a monthly/quarterly basis. The five-star average for staffing includes the average number of actual hours and minutes per day for certified nurse assistants,

registered nurses, and licensed practical nurses. Data for adjusted staffing also is provided which is a combination of what staff is expected based on acuity and what is occurring in the nation. The CHRSA reports contained statewide and national data comparing the performance of nursing facilities in categories including quality indicators and quality measures, five-star data, and deficiency indexes.

PCC is an electronic medical record system that was used by Atrium for its Wisconsin facilities. Records and information in PCC for the Atrium Wisconsin facilities included resident medical records, hospital medical records and discharge documents, resident assessments, plans of care, interdisciplinary progress notes, physician progress and treating notes, minimum data set, incident reports, and Situation, Background, Assessment, and Recommendation ("SBAR") reports.

During the investigation, federal law enforcement agents and investigators interviewed witnesses and wrote memoranda of interviews ("MOIs") and reports of interviews ("ROIs") summarizing answers by witnesses to questions. Each federal law enforcement agent and investigator who wrote a MOI or ROI of a witness interview attended that interview. Exhibits were used during some interviews that included photographs of some of the facilities, emails, and documents.

Rule 703 permits an expert opinion based on hearsay. It is a fundamental premise that expert witnesses may rely on hearsay evidence when forming their opinions and can base such opinions on information that itself is inadmissible as substantive evidence. *See Walker v. Soo Line R.R.,* 208 F.3d 581, 588 (7th Cir.2000) (under Rule 703, expert can rely on work of others, including reports and opinions). An expert witness "is not required to verify all the facts on which he relies; he can rely on hearsay . . . provided that such reliance is an acceptable practice in his

profession." *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015). Ms. Bessette could rely on witness interview reports because it is a type of information reasonably relied upon by experts in her field regarding violations of the standards of care. *See Sansone v. Brennan*, 917 F.3d 975, 982 (7th Cir. 2019) (Rule 703 permits experts, in forming an opinion, to rely on inadmissible facts and data reasonably relied upon by experts in the particular field); *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) (same).

The rationale for this exception to the hearsay rule is that because of an expert's professional experience, knowledge and ability, the expert is competent to judge for herself the reliability of records and statements on which she bases her expert opinion. *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971). Indeed, an expert's opinion must invariably rely, at least in part, on sources and records that can never be proven in court. *Id*. An expert's opinion is derived from the expert's lifetime of experience and education, not just from a review of records, documents, and data. *Id*. An expert may consult several sources and analyze that information, and coupled with her own professional experience and knowledge, arrive at an expert opinion that is regarded as evidence, not a disguise for hearsay. *Id*. Witness interview reports from law enforcement special agents are a source reasonably relied upon by experts in the nursing industry field.

Ms. Bessette read and analyzed the witness interview reports along with the numerous progress notes and medical records in PCC. Many issues and areas of concern raised by many of staff at various Atrium Wisconsin facilities in the interview reports also were set forth in other documents Ms. Bessette reviewed and analyzed, including extensive medical records, progress notes, incident reports, photographs, emails, SODS, third-party vendors to Atrium's staff at the nursing facilities, Midwest Office, and New Jersey Headquarters. Attached to some of the

interview reports were photographs, emails, and documents which provided an additional level of review. The witness interviews were one category of records reviewed that are of the type reasonably relied upon by experts in the nursing industry field and were not the sole basis for her opinions. *United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) (reliance on photographs, third-party observations, and reports which may not have been admissible into evidence was a reliable basis for expert's testimony because the materials were of a type reasonably relied upon by expert in the field). Ms. Bessette listed 46 witness interview reports which she reviewed and relied for her independent opinions. She did not wholesale adopt conclusions of others from the witness interview reports. Moreover, the resident cases and SODs she reviewed provide additional support for her opinions regarding topics addressed in the witness interview reports.

Based on her extensive experience, Ms. Bessette exercised her independent judgment that was not the product of conjecture. Moreover, her opinions are not based solely on information from the witness interview reports. Further, she will not parrot out-of-court testimonial statements to the jury. Objections to the reliability of out-of-court materials relied upon by Ms. Bessette go to the weight, not admissibility, of the evidence. At trial the defendant will have the opportunity to cross-examine Ms. Bessette regarding this category of documents she reviewed. Expert witnesses may offer their independent judgments that were in some part informed by their exposure to otherwise inadmissible hearsay. Fed. R. Evid. 703.

Distinguishable is *Summerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. 2008). In *Summerfield*, a civil rights action discrimination case, the plaintiff's expert relied solely on two documents for his opinions, the plaintiff's second amended complaint and a written short summary prepared by the plaintiff's attorney of 11 voluminous deposition transcripts which were selected by the plaintiff's attorney from the 17 depositions taken. *Id*. at 318, 320-22. The actual deposition

transcripts were available but not provided to the expert. *Id*. at 322. The district court found that Rule 703 does not permit an expert to base an opinion on the plaintiff's attorney's summaries of the deposition transcripts. *Id*. at 320. The district court stated that there was no justification for not providing the actual deposition transcripts to the expert and expressed concern that the plaintiff's attorney had prepared the summaries in the midst of the case. *Id*. at 322-24.

Such is not the case here. Ms. Bessette was not provided written summaries prepared by an attorney for the government of witness interview reports. To the contrary, Ms. Bessette was provided the witness interview reports, attachments and exhibits of all interviewed witness (over 220 individuals), comprising over 3,000 pages of materials. A government attorney or law enforcement special agent did not select certain witness interview reports, read and prepare summaries of the selected witness interview reports, and then only provide the summaries and not the actual witness interview reports to Ms. Bessette. Thus, Ms. Bessette was entitled to rely upon the witness interview reports in forming her opinions.

Moreover, the defendant falsely equates SODs with witness interview reports. SODs are not prepared for litigation and are not interview reports. SODs document deficiencies that constitute non-compliance with federal requirements and regulations governing nursing facilities and must be approved by CMS. This is because the CMS oversees payment to skilled nursing facilities for the Medicare and Medicaid programs and the nursing home oversight and compliance programs. For skilled nursing facilities to receive payment from the Medicare or Medicaid programs, they must be in compliance with the federal requirements set forth in 42 CFR Part 483, Subpart B. A skilled nursing facility or nursing facility must be certified to receive payment under the Medicare or Medicaid programs. With the exception of state operated facilities, CMS contracts with the states who are responsible for completing the survey process and certifying compliance

or non-compliance of all skilled nursing facilities and nursing facilities. A certification of compliance means the facility is in compliance with federal requirements. To be certified, trained state surveyors conduct an unannounced survey on the skilled nursing facility or nursing facility and assess the facility to ensure such compliance. These long term-care surveyors, some of whom are nurses, are well trained to perform the inspections and are required to meet minimum qualifications established by the Secretary of Health and Human Services, including successful completion of a Surveyor Minimum Qualifications Test and other training.

All surveyors are required to use the SOD Form CMA-2567 to assess compliance. Should a nursing facility not challenge on appeal the SODs finding of non-compliance, those findings are administratively final and binding. The CMS is required by law to post publicly the SODs because they are findings of deficiencies which permits the public to have access to the deficiency findings. 42 U.S.C. § 1395i-3(g)(5)(A). Here, the SODs issued for the Atrium Wisconsin facilities constitute final findings of deficiencies by the CMS. Plans of corrections agreed to by the defendants as a result of a SOD will never remove the SODs and the findings contained therein. The government is unaware of the defendants completing an appeal of any SOD for the Atrium Wisconsin facilities during the defendants' operation of those facilities.

Under Rules 702 and 703, expert testimony does not need to be based on first-hand knowledge or on research conducted by the expert. *See Daubert,* 509 U.S. at 592; *Walker,* 208 F.3d at 588; *Mihailovich v. Laatsch,* 359 F.3d 892, 919 (7th Cir.2004) ("[T]he *Daubert* framework is a flexible one that must be adapted to the ... type of testimony being proffered."). As the Seventh Circuit in *Walker* noted, "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable." 208 F.3d at 588 (collecting cases). In this matter, experts for either side have to rely upon reports regarding the conditions at Atrium

Wisconsin facilities during the relevant timeframe, since as of September 7, 2018, a court appointed receiver took over control and operation of the facilities.

### B. Ms. Bessette Properly Considered Staffing Levels

Pursuant to federal requirements, nursing facilities "must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at §483.70(e)."[1] 42 CFR § 483.35.

Ms. Bessette may render an opinion on staffing based on her experience and her review of records that showed the Atrium Wisconsin facilities were insufficiently staffed. The facilities have to know each resident's needs to be able to provide staffing to meet the needs of the residents. Thus, while each state may have minimum staffing levels, this is the floor. Based on the acuity and diagnosis of the residents the actual staffing needed will vary. As set forth in her report, Ms. Bessette reviewed records and documents, including medical records, SODs, and witness interview reports, that led her to conclude the facilities had insufficient staffing.

The SODs contained findings of deficiencies for insufficient staff. Other findings of deficiencies in the SODs are indicative of not having enough staff, including failure to use two-person assist, failure to provide hygiene care, residents not receiving showers, call bells not timely answered, physician-ordered treatments were not completed, and residents being left on toilets for long periods of time because there was not enough staff to help transfer. Similarly, witness

---

[1] Section 483.70(e), now §483.71, is a complete facility assessment to determine a facility's required resources to care for its residents competently during daily operations and emergencies.

14

interview reports revealed short staffing because there were medication errors, voids were not cleaned up, rounds were not made, staff had to cover multiple staffing positions due to staff shortages, and staff stated there was not have enough staff and how it affected their ability to care for the residents. In addition, as sets forth in the five-star rating system section of Ms. Bessette's report, quality indicators signaled problematic areas and at least some of those were indicative of insufficient staffing including falls and pressure injuries.

    C.    **Ms. Bessette Is Qualified To Render An Opinion On Emergency Preparedness And How The Physical Environment Impacted Resident Care and Others**

Under the standards of care, residents in nursing facilities have the right to a safe environment. 42 CFR § 483.10(i). Nursing facilities also must operate in compliance with federal, state, and local laws and professional standards. *Id*. § 483.70(b). Nursing facilities are required to be equipped and maintained in a manner to protect the health and safety of its residents, personnel, and the general public. 42 U.S.C. § 1396r(d)(3)(B). Contrary to the defendant's assertion, Ms. Bessette has experience in emergency preparedness. When she was director of nursing, she often communicated with maintenance staff about repairs and replacement of items inside and outside the nursing facility. For emergency preparedness she ensured staff knew and participated in drills to make sure the facility was prepared for an emergency, and regularly checked the facility, inside and outside, for fire safety, evidence of disrepair or non-repair that could lead to safety issues, and the presence and operability of safety mechanisms including alarm doors. In her work experience and consulting work, her review of whether nursing facilities were in compliance with federal requirements included a review of safety and emergency preparedness.

Ms. Bessette reviewed and analyzed witness interview reports setting forth physical environment issues including the presence of mold, leaking roofs, crumbling walls, dirty air vents, and holes in windows. Color photographs attached to the interview reports depicted actual

conditions in the nursing facilities. The SODs also contained deficiency findings regarding non-compliance with federal requirements for the physical maintenance and environments of the Atrium Wisconsin facilities. After reviewing those documents, photographs, and CMS findings, Ms. Bessette opined that conditions were deplorable, not safe, and impacted the residents who lived there and staff who worked there. While the defendants may take issue with her independent opinion that the physical environments of the Atrium Wisconsin facilities constituted non-compliance with the federal requirements, she is qualified to render those opinions. The defendants may vigorously cross-examine her to challenge her opinion that these conditions constituted deplorable conditions for residents to live and staff to work.

> **D.** **Ms. Bessette Is Qualified To Render An Opinion On Other Non-Compliance Issues**

Ms. Bessette may state her opinions whether the defendants' failures to maintain and properly operate the Atrium Wisconsin facilities constituted non-compliance with the federal requirements. Her opinion, based on her review of multiple sources, records, and her experience, that the defendants crippled the nursing facilities, goes to weight and not admissibility because the defendant may challenge her opinion on a vigorous cross-examination. For example, the defendant may cross-examine Ms. Bessette that there was no event or events that crippled the nursing facilities including (1) the non-payment of vendors which resulted in insufficient food to feed the residents, affected the quality of resident care, and impacted the staff's ability to care for residents; (2) Staff going to stores to buy food to feed the residents; (3) not having appropriate supplies; (4) not addressing mold in the facilities, repairing leaking roofs, and making other facility repairs; (5) facilities being threatened with discontinuation of vital services from public utilities because bills were not paid timely; and (6) staff being unable to perform the required levels of resident care due

in part to staff shortages and third-party contractors who stopped providing agency staff nurses due to non-payment.

Based on her experience and review of several sources including records contained in the PCC electronic medical records system, witness interview reports, and SODs, it is Ms. Bessette's opinion that the defendants were out of compliance with federal requirements and regulations in several areas, including infection control, food and nutrition services, physician and family notifications, and assessments and care planning. The SODs are findings of deficiencies and the witness interview reports included Atrium Executives and Atrium staff. The detailed review of the resident cases in the Appendixes further support her opinions.

Rule 704(a) explicitly permits an expert witness to opine regarding an ultimate issue. Rule 704(a) provides that, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). The narrow exception in Rule 704(b) only prohibits an expert witness from stating an opinion about whether the defendant had the mental state or condition that is an element of the charged crime or a defense thereto. *Diaz v. United States*, 602 U.S. ---, 144 S.Ct. 1727, 1733-34 (2024); *accord United States v. Kohli*, 847 F.3d 483, 492 (7th Cir. 2017) (while it is permissible for a physician to testify as to his or her opinion on whether certain actions are medically justified or within standard medical practice, it is not permissible for a physician to opine on legal standards or tell a jury what the law means); *Pansier*, 576 F.3d at 738 (expert witness in legitimate and fictitious financial instruments and banking could state his opinion "as to the ultimate issues that the sight drafts were fictitious financial instruments and were purportedly drawn on a Treasury Direct account under the authority of the United States"; expert did not testify to the defendant's intent to defraud or state of mind).

Ms. Bessette does not render an opinion in contravention of Rule 704(b) about whether the defendant possessed the *mens rea*, the mental state or condition that is an element of the health care fraud charge in Count One of the Indictment or a defense thereto. *See Diaz*, 602 U.S. ----, 144 S.Ct. at 1733. Therefore, Ms. Bessette may testify on ultimate issues consistent with Rule 704(a). *United States v. Turner*, 400 F.3d 491, 499 (7th Cir. 2005).

Finally, Ms. Bessette's expert testimony is necessary to assist the jury in understanding the evidence, the standards of care, federal requirements and regulations, and to evaluate whether the defendants violated the federal regulations. For an expert's testimony to be relevant, it "must have something 'useful to say' about the particular circumstances at issue." *Downing*, 48 F.4th at 810 (citation omitted). Federal requirements for nursing facilities are not within the common understanding of most jurors. Since most jurors would not be familiar with quality indicators, quality measures, the numerous rights of residents of nursing facilities, and the breadth of the standards for quality of resident care, Ms. Bessette's testimony will assist the trier of fact in understanding the evidence. *Daubert*, 509 U.S. at 592; *Hall*, 165 F.3d at 1102.

Rule 702 does not mandate, as a prerequisite, that an expert witness have an intimate level of familiarity with every component of a transaction. *Microfinancial Inc. v. Premier Holidays Int'l., Inc.*, 385 F.3d 72, 80 (1st Cir. 2004). Expertise may be based on experience and training. *Conn*, 297 F.3d at 556. In certain fields, experience can be predominantly the basis for much of the reliable expert testimony. *Id*. (citing Fed. R. Evid. 702, 2000 advisory committee note); accord *Wielgus v. Ryobi Technologies, Inc.*, 893 F.Supp.2d 920, 931 (N.D. Ill. 2012).

WHEREFORE, based on the foregoing, the government respectfully requests that the defendant's Motion to Exclude Government Expert Suzanne Bessette be denied.

Respectfully submitted,

TIMOTHY M. O'SHEA
UNITED STATES ATTORNEY

AMANDA N. LISKAMM
DIRECTOR
CONSUMER PROTECTION BRANCH
U.S. DEPARTMENT OF JUSTICE

/s/ *Karla-Dee Clark*
Karla-Dee Clark
Steven R. Scott
Rowan Reid
Trial Attorneys
U.S. Department of Justice
Consumer Protection Branch
450 Fifth Street, NW, Suite 6400S
Washington, D.C. 20001
Clark (202) 532-4098; Scott (202) 286-5293; Reid (202) 532-4315
Karla-Dee.Clark@usdoj.gov;
Steven.R.Scott@usdoj.gov;
Rowan.L.Reid@usdoj.gov